## ELIZA SCOTT et al. v. R. S. KEY et al.

An infant, or minor born out of wedlock, son of a resident of Arkansas, was, by an Act of the Legislature of Arkansas, legitimated, or put upon the same footing, as if his parents had been married at the time of his birth. The question was, whether he could inherit, as a legitimate child, property in Louisiana.

The heritable quality of legitimacy which W E. had received from the Legislature of the State of his residence, accompanied him when he changed his domicil.

A general law of the place of domicil, changing the *status* of its citizens according to circumstances, is a personal statute, accompanying the party to every other country; provided the circumstances which operate such change, have occurred before the change of domicil. So, a special law, removing a disability from a particular citizen by name is such a personal statute.

The Legislature of Arkansas gave to W. E. the *status* of a legitimate son of S. E., and this *status* accompanied W. E. into whatever country he might go.—SPOFFORD, J

W. E came hither with his *status*. He inherited, *by our law*, from his father S. E, because he was, to all intents and purposes, a legitimate son, having become so *by* the law of the domicil of his origin, and not in fraud of our law, nor in violation of its policy.—SPOFFORD, J.

The statute of Arkansas must have as much effect, and no more, as a general law of that State would have, wherein it should be declared that all natural children born, or resident in the State of Arkansas, should be considered as legitimate and inherit from their fathers the same as if born in wedlock. Were such an Act allowed to have any extra territorial effect, another State would be permitted to provide a new class of heirs for immovables and successions in Louisiana.—MERRICK, C. J., dissenting.

Foreign jurists class statutes in regard to legitimacy or illegitimacy, as personal. But, in principle, such statutes should have effect only where they cure some want of formality in regard to the marriage of persons who have really lived together as husband and wife, and not where at most they create a purely fictitious *status*.—MERRICK, C. J., dissenting.

Conceding the statute of Arkansas to be a personal statute, it is against the policy of our laws to enforce it to the exclusion of the heirs at law, as regulated by the Civil Code.—MERRICK, C. J., dissenting.

There can be no safe rule except to consider those only as legitimate children whose parents have at some time lived together as man and wife. *Hæres et filius est quem nuptiæ demonstrant.* The Civil Code designates what persons shall inherit, and when a person presents himself, who has not the qualities required by our law, except in an absolute fiction created by the statute of another State, the real facts of the case should be looked at, and the inheritance given to those entitled under our own laws.—MERRICK, C. J., dissenting.

Code, 219, 224, 882, 910.

APPEAL from the District Court, Tenth District, parish of Carroll, *Snyder*, J. *Short & Parham* and *Goodrich & De France*, for plaintiffs. *Selby*, for defendants and appellants.

The counsel for plaintiffs made the following points:

SCOTT<br>*v.*<br>KEY.

Did *William Estill* have any heritable right in the estate of *Samuel Estill?*

In order to arrive at a proper solution of this question, it becomes necessary to consider the force and effect of the statute of legitimation passed by the General Assembly of the Territory of Arkansas, by which, to use the language of that Act, *William Estill* "was made the legal heir and representative of *Samuel Estill* in as full and ample a manner as though he had been such from his birth, and as capable of inheriting the estate of the said *Samuel* as though said *Samuel* had been married to his mother at the time of his birth, and thereafter to be known and called by the name of *William Estill*."

Is this a real, a personal, or a mixed statute?

We will examine it under each of these aspects, and under whichever it may be placed, it will unquestionably appear that *Wm. Estill* was without any right or capacity of heirship to the estate of his father, and that the plaintiffs in this case, the brothers and sisters of *Samuel Estill*, and their descendants, will be declared to be his true heirs.   Fortunately for our investigations, the principles and distinctions involved in this abstruse, intricate branch of jurisprudence, have been elaborated with great learning, and adjudicated with great ability by this tribunal—the earliest and leading case being that of *Saul* v. *His Creditors*, 5 N. S., 569.

I. Then, let us suppose this to be a real statute, which is defined to be one, which regulates property within the limits of the State where it is in force.  If it be, then it can have no extra territorial effect on the account of *Sam. Estill's* succession when opened in this State.   *Brosnaham* v. *Turner*, 16 L., 433.

II. Suppose it to be a personal statute.   This court has adopted, in the case of *Saul* v. *His Creditors*, the definition of Chancellor D'Augusseau who considers a personal statute to be "where all the attention of the law is directed towards the person, to provide in general for his qualification, or his general and absolute capacity: as when it relates to the qualities of major or minor, father or son, legitimate or illegitimate," &c., p. 594.   It would then be controlled—

1st.  By the law of legitimation in our State, viewing it also in the light of a personal statute; for, upon the same authority, a personal statute here controls a conflicting personal statute of another State which seeks to enforce a right here, p. 590, 597.   This operates as well whether the organic or statutory law operates.   Con. of Laws, p. 11, § 10. 3 An., 426.   (Bottom,) but—

2d.  The real statutes of the situation must prevail over the personal statutes of the domicil, p. 586.  It would be idle to assert that *Samuel* and *William Estill* could import into the State of Louisiana a statute of Arkansas, passed for their benefit there, which conflicts with one of her real statutes, and changes the line of inheritance established by her laws.   The property of a succession within the State must be distributed by the laws of the State.   11 M., 26; 3 N. S., 1; 7 N. S., 44; 5 An., 158.

Judge Story, in his Conflict of Laws, after reviewing all the principles governing this branch, arrives at the conclusion "that the heir, whether by testamentary, or by intertacy of immovable property, can take only according to the lex loci rei sitæ, or, in other words, he is not admissible as heir unless he is duly qualified according to the principles, rules and forms of the local law." Con. of Laws, p. 419, § 509.

It cannot be pretended, in this case, that *Wm. Estill* was ever so qualified. Again:· The descent and heirship of real estate is exclusively governed by the law of the country within which it is actually situated.   Con. of Laws, p. 404, § 483.  The utmost that could be claimed for *Wm. Estill* would be that of a natural child.  C. C.   The utmost he could claim from his father's succession would be alimony.  C. C., 227, 914.   The only heir he would take precedence over, would be the State.  C. C., 913, 914; 2 An., 98; 6 An., 156.  And even all this on the hypothesis that the requirements of the local law had been complied with.   An acknowledgment of an illegitimate child has, under our law, a peculiar formality.  C. C., 217.   This does not appear ever to have been complied with.   A mere verbal or general acknowledgment or recognition, does not meet the case, and an admission to that effect amounts to nothing.   It does not appear, from the Record, that the mother of *Wm. Estill* was ever in the State of Louisiana.   The conclusion to which we must irresistibly arrive, under

this division of the case, considering the statute as a personal one, is, that its effect and operation are controlled by one law ; and that *Wm. Estill* could take nothing to the exclusion of those recognized by our laws as the proper heirs of *Samuel Estill.* But—

3. Let us suppose the Arkansas statute to be a mixed statute, which is defined to be " one which concerns, at once, persons and property." This would seem to be really the character of the statute of legitimation, but Merlin, after giving the foregoing definition, discards such a classification as unnecessary, or as comprehended in the other two. Story's Con. of Laws, p. 12. If such a classification is admitted, we have only to add, that if, neither as a real or personal statute, it can bestow on *Wm. Estill* the estate of his father, it cannot do so as a mixed statute, as it could acquire no additional virtue or efficacy from the combination.

Thus, we think that we have established the proposition with which we set out, that under neither of these categories can *Wm. Estill's* heirs, his natural half-brothers and sisters, claim the estate of *Sam. Estill*, and are enabled to regard this Arkansas statute in its true light.

It cannot be denied that within the limits of the State of Arkansas, its operation was absolute and complete ; but the moment *Sam. Estill* and *Wm. Estill* ceased to be citizens of that State, and moved beyond its limits, that moment they renounced and forfeited all the benefits and advantages it was intended to secure to them. The point relied on by defendant's counsel, in the previous argument of this case, as to the right of States to pass such Acts, does not meet the question. It presents an issue only when such Acts are sought to be made operative elsewhere, and then they are regulated alone by the comity of States. " It is plain," says Judge Story, " that the laws of one country can have no intrinsic force, proprio vigore, except within the territorial limits and jurisdiction of that country. They can only bind its own subjects and those who remain within its jurisdictional limits. No other nation or its subjects are bound to yield the slightest obedience to those laws. Whatever extra-territorial force they are to have, is the result not of any original power to extend them abroad, but of that respect, which, from motives of public policy, other nations are disposed to yield, giving them effect with a wise and liberal regard to the common convenience and mutual benefits and necessities." Con. of Laws, p. 757. Again, he says, p. 32 : " It is difficult to conceive upon what ground a claim can be rested to give to any municipal laws an extra-territorial effect, when those laws are prejudicial to the rights of other nations or to those of their subjects." So, also, this court has decided, that while contracts may be governed by the laws of the country where they are made, they cannot be enforced to the injury of a State whose aid is required to carry them into effect. *Saul* v. *His Creditors.* Thus—

4th. We arrive at the conclusion that this Arkansas statute has only such force and vitality as our jurisprudence will give it, with due regard, and without prejudice to the rights of our citizens. Should the natural half-brothers and sisters of *Wm. Estill* be declared the heirs to the property in controversy, we submit that it would exceed the comity which regulates it, and be extremely prejudicial in its operation.

The principles which should govern in determining the legitimacy or status of *Wm. Estill*, must be distinguished from those which usually prevail in such cases. The general rule is, that the question of legitimacy or illegitimacy is to be decided exclusively by the law of the domicil of origin. And the governing maxim Pater est, quem justiæ nuptæ demonstrant legitimacy, established by the subsequent marriage of the parents, is admitted everywhere, and this for the reason that the institution of marriage is recognized jure gentium. It is very different, both from principle and policy, when a statute assumes the functions of a natural relation, demanded for the good of society, by the requirements both of the civil and divine law. Judge Story in his learned and elaborate discussion of this branch of jurisprudence, contemplates only the legitimacy that results from intermarriage between the parents, never regarding such a thing as statutory legitimation ; and after giving even the former its utmost scope, quotes from the decision of the King's Bench this conclusion : " The very rule, that a personal status accompanies a man everywhere, is admitted to have this qualification, that it does not militate against the law of the country where the consequences of that status are sought to be enforced." Con. of Laws, p. 87, 91. So that we conclude—

5th. The Arkansas statute did not bestow such a status or legitimacy on *Wm. Estill* as to make him legitimate elsewhere than at the domicil, being exceptional and different from that legitimacy flowing from marriage, which is recognized jure gentium.

From an examination of the phraseology of that statute, it will be seen that *Wm. Estill* is described as the infant son of *Sam. Estill*, and not of him and *Mary Coleman*, the mother. And the Judge à quo was of the opinion, conceding that *William* could have been maintained in the possession of the property during his life, at his death it must pass to the heirs of *Sam. Estill*, the father, who, by the terms of the statute, had made the only public acknowledgment of him. C. C., 913, 916; *Succession of Briscoe*, 2 An., 268.

In conclusion we have only to add, that in addition to the above, the whole current of principles in the learned commentary of Judge Story on Conflict of Laws, and the whole reasoning of this tribunal in the case of *Saul* v. *His Creditors*, which, by the way, is the fruitful source to which Judge Story is indebted for his leading principles and data, all sustain the decision of both the Judges à quo; an affirmance of which is respectfully asked.

*Selby*, for defendants :

*Samuel Estill* and his infant son, *William Estill*, in 1835, living in and being citizens of Arkansas, where they had been, before and afterwards, by a law of Arkansas, were made heirs to one another.

It is contended that *William Estill*, being once the heir of *Samuel*, in Arkansas, was always his heir, till his death; and that the removal from Arkansas to Louisiana, did not deprive him of the heirship.

It is only by the statutes, the written laws of the State, that legitimate children inherit to the exclusion of others. L. C., 882 et seq.; idem, 898 et seq. Were all the statutes upon this subject repealed, the distinction between legitimate and illegitimate children would be gone. Legitimate children succeed to the property of their parents only by virtue of written laws, and perhaps not always to those who beget them : for children conceived during marriage, and those whose parents intermarry at any length of time after their birth, inherit. L. C., 203 and 217.

It is contended that Arkansas as well as Louisiana, can repeal or alter her laws on this, or any other subject, not prohibited by the United States Constitution or Laws, generally or specially, as in the case of *Samuel* and *William Estill*, father and son. Throughout the United States we have numerous instances of special laws making even strangers heirs to each other, dispensing with the usual age of majority, and changing the names of persons. Such laws in Louisiana are very numerous. Acts of 1852, pp. 214, 199, 177, 175, 161, 152, 151, 148, 147.

Louisiana sustains such special laws passed by her own Legislature, and Arkansas within her territory would sustain this law in favor of the *Estills*. "Full faith and credit shall be given in each State to the public acts, records and judicial proceedings of every other State." U. S. Const., Art. VI, Sec. 1., and a fortiori, the laws of another State will be sustained ; for the laws of a State are its most public acts.

The argument of plaintiffs' counsel, that the statute is real, and that to give it effect here, would be to admit Arkansas to change the laws of descent of real property in Louisiana, to me, is not obvious. As I understand the books, no part of the statute is real, and if it were, I do not perceive its application to the case at bar.

A will made in, according to the laws of another State, although not having the requisitions prescribed by the laws of Louisiana, may pass lands here. 3 A. R., 579; 6 A. R., 522. This would appear as much changing the laws of descent as would the statute making *William* the heir of *Samuel Estill*.

By the laws of Louisiana, the marriage of the father and mother at any time after its birth, makes the child legitimate. L. C., 217. In Arkansas it is not so. In such a case, were the parents and child, after the marriage, to remove from Louisiana to Arkansas, would the child again become illegitimate ? When the name of a citizen of Louisiana has been changed by her Legislature, must he take his original name again by removing to another State ? Were a widow to marry in Mississippi, where there is no prohibition against it, before her first husband had been ten months dead—L. C., 134—and after having raised a family from the marriage, come with it to Louisiana, would her marriage be-

come illegal, her children illegitimate, and her collaterals take her property upon her death from her children? These are a few of the many examples which may be put.

Our statute books are full of special laws dispensing with the age of majority, changing names, and making those heirs who, by the general laws, were not so. It would seem to be as immoral in Louisiana to do so as in Arkansas—if there is any immorality in so doing. And it is only by the written, the statute laws, that the legitimate child is preferred to the illegitimate. By nature it is not so; and there is no natural reason why it should be.

BUCHANAN, J. This cause has already been before this court, and was remanded to make proper parties defendant. See 9 An. 213.

Plaintiffs are the surviving brother and sisters of Samuel Estill, deceased, and the children of a deceased brother of said Samuel. They claim to be heirs at law of Samuel Estill. The defendants are the curator, and the half-brothers and sisters, heirs of one William Estill, who was a natural son of Samuel Estill, but legitimated by a statute of the State (then territory) of Arkansas, of which Samuel and William Estill were at the time residents, passed October 27th, 1835, and entitled "an Act to legitimatize the son of Samuel Estill." For a copy of the said statute in full, see the report of this case in 9th Annual.

The question now presented for our decision is, whether the statute in question had an extra territorial effect, and enabled William Estill to inherit, as the legitimate son of Samuel Estill, the property left by the latter in Louisiana. The solution of this question appertains to a distinction (which has been recognized by various decisions of the Supreme Court of Louisiana) of statutes real and statutes personal. The leading case on this subject is Saul v. His Creditors, 5 N. S., in which it was decided, that the general law of Virginia, which renders property acquired during marriage, the property of the husband, is a real statute, which did not follow a couple, who had contracted marriage in Virginia, into the State of Louisiana, where they resided many years, and where the wife died; but that property acquired in Louisiana after their removal thither, entered into the matrimonial partnership of our law, and on the dissolution of the marriage, belonged one-half to the wife's heirs. And in the case of Banna v. Alpuente, 6 N. S. (the same Judge, Porter, who had, in the case of Saul, reviewed all the authorities, being the organ of the court,) it was decided that the laws of the domicil of origin, govern the state and condition, into whatever country the party removes; in other words, that such laws are personal statutes. And those two decisions are in harmony with the definition by Chief Justice Eustis, of the real and personal statute, in the case of the Augusta Insurance Company v. Morton, in 3 An. 426: "Those laws are real," says the learned Judge, "in contradistinction to personal statutes, which regulate directly property, without reference to the condition or capacity of its possessor." There are some expressions of Judge Strawbridge, in the case of Brosnaham v. Turner, 16 L. R. 439, which are relied upon by plaintiffs' counsel, and which are scarcely consistent with this definition. But the decision in Brosnaham v. Turner, turned upon a totally different point, the validity of a Sheriff's sale. The remarks in Brosnaham v. Turner, as to the incapacity of the testamentary heirs of Villarude to inherit in Louisiana, under a will probated under the authority of a statute of Florida, are at best but obiter dicta, and besides refer to a very different state of facts from that presented in this case. Here, an infant, or minor, son of a

resident of Arkansas, born out of wedlock, was, by an Act of the Legislature of the country of his domicil, legitimated, or put upon the same footing as if his parents had been married at the time of his birth.

It is admitted of record, that *William Estill*, then a small child, October 27, 1835, resided with his natural father, *Samuel Estill*, in Arkansas, who was then a citizen of Arkansas, and resided in Arkansas, and that both of them resided therein for several years before 1835, and also continued to reside in Arkansas until some time between 1837 and 1841." Arkansas was then the *bona fide* domicil of the *Estills*, at the time of the passage of the Act of the Legislature in question. *William* was, by law, the legitimate son of *Samuel* in Arkansas. Can it be said, that he lost his *status* by crossing the State line into the frontier parish of Carroll, some years afterwards? We think not. The heritable quality of legitimacy which he had received from the Legislature of the State of his residence, accompanied him, when he changed his domicil.

The error of the judgment appealed from, consists in regarding *William Estill* as illegitimate, at the time of his father's death. But he was not so. The original taint of illegitimacy had been removed by the Act of the Legislature. Legitimacy and illegitimacy are the result of positive laws, which differ very materially in different countries./ To illustrate this idea, suppose *William Estill* had been born in Louisiana, and, that after his birth, his father and mother had got married in Louisiana, and subsequently to their marriage, removed with their child to Arkansas. Their marriage after his birth, would have legitimated their offspring by the law of their domicil; yet, by the law of Arkansas, a subsequent marriage would not have produced that effect. Nevertheless, the *status* of legitimacy being acquired in Louisiana, would have accompanied him into Arkansas. There are many precedents, in the legislation of various States of this Union, of legitimation by Act of the Legislature, and particularly in Louisiana. This seems identical with the legitimation *per rescriptum principis* of the Roman law.

Voet, Commentarius ad Pandectas, lib. 25, tit. 7, sections 4 and 13.

If it be true that a general law of the place of domicil, changing the *status* of its citizens according to circumstances, is a personal statute, accompanying the party to every other country, provided the circumstances which operate such change, have occurred before the change of domicil, which we consider to be the doctrine settled in Louisiana; *a fortiori*, is a special law, removing a disability from a particular citizen by name, such a statute? The constitutional power of the Legislature to enact such exceptional enabling statutes, was drawn directly in question, and ruled affirmatively, in the case of *Pritchard* v. *Citizens Bank*, 8 L. R. 133. The maxim cited by Story, Conflict of Laws, § 51, from Boullenois, "Habilis vel inhabilis in loco domicilii, est habilis vel inhabilis in omni loco," must therefore be deemed law in Louisiana.

And it is not correct to say, that the statute of Arkansas, to legitimate *William Estill*, (which is a personal statute) conflicted with the statute of distributions of Louisiana (which is a real statute); and consequently, as was held in *Saul's* case, is overruled by the latter statute. By the Louisiana statute of distributions, the legitimate son inherits in preference to the brothers and sisters of the deceased. By the effect of the statute of Arkansas, *William Estill* was the legitimate son of *Samuel Estill*. Upon the demise of *Samuel Estill* in Louisiana, in 1849, fourteen years after that statute, *William Estill*, as his legitimate son, was his heir, by the law of Louisiana.

Scott
*v.*
Key.

In confirmation of this view of the subject, we may quote the language of the High Court of Errors and Appeals of Mississippi, in the case of *Smith* v. *Kelly*, 23 Mississippi Reports, 170 : "It is a well settled principle, that the *status* or condition, as to the legitimacy, must be determined by reference to the law of the country where such *status* or condition had its origin."

Judgment of the District Court reversed; and judgment for defendants, with costs in both courts.

SPOFFORD, J. It was competent for the Legislature of Arkansas, the domicil of his origin, to fix the *status* of *William Estill.*

In substance and effect, that Legislature gave him the *status* of a legitimate son of *Samuel Estill.*

The Arkansas statute, legitimating *William Estill*, was a personal statute.

Therefore, the *status* of a legitimate son of *Samuel Estill*, would accompany *William Estill* into whatever country he might go.

He came hither with the *status.* He inherited, by our law, from his father, *Samuel Estill*, because he was to all intents and purposes, a legitimate son, having become so by the law of the domicil of his origin, and not in fraud of our law, nor in violation of its policy.

I, therefore, concur in the opinion and judgment of Mr. Justice BUCHANAN.

MERRICK, C. J., dissenting. I find myself unable to concur in the opinion of the majority of the court.

The difficulty in my mind, arises from the facts admitted by the parties, by which it appears that *Samuel Estill* was never married to *Mary Coleman*, the mother of *William Estill;* that she had been previously married to one *Richard Burnett*, by whom she had two children; that after the death of *Burnett*, she conceived and gave birth to *William Estill;* and that after the birth of *William Estill*, she married *Edward House*, by whom she had six children, the defendants in this suit.

It does not appear whether the Act of the Legislature of Arkansas was passed before or after the marriage of *Mary Coleman* with *Edward House.* The term infant used in the statute, means one under the age of twenty-one years. The Legislature of that State, without doubt, had power to enable *William Estill* to inherit from his acknowleged father, all effects situated within its boundaries.

The statute must have as much effect, and no more, as a general law of that State would have, wherein it should be declared that all natural children born or resident in the State of Arkansas, should be considered legitimate and inherit from their fathers, the same as if born in wedlock. Were we to allow such an act to have any extra-territorial effect, we should allow another State to provide a new class of heirs for immovables and successions in Louisiana.

It is true, that foreign jurists class statutes in regard to legitimacy or illegitimacy, as personal. But on principle, it seems to me, that such statutes should have effect only when they cure some want of formality in regard to the marriage of persons who have really lived together as husband and wife, and not where, at most, they create a purely fictitious *status.*

And the law in regard to legitimacy, does not appear to be extended by civilians, to any case except where there has been a marriage. The maxim is, *Pater est quem justæ nuptiæ demonstrant.* Story says, that this maxim is true only in a limited sense in the civil law. In applying it, he says: " They, the

· civilians, therefore hold, that if by the law of a country, (as Scotland,) a man born a bastard becomes. legitimate by a subsequent marriage of his parents, he ought to be deemed legitimate everywhere." Story, § 93, 94 and 105.

But in England, a contrary doctrine prevails, and it has been held, that "A child born in Scotland, of unmarried parents, domiciled in that country, and who afterwards intermarry there, is not by such marriage rendered capable of inheriting lands in England." *Doe* v. *Vardeli*, 5 Barnwell & Cress., 11 Com. Law Rep. 266.

The doctrine of the civil law ought to be enforced doubtless, in those cases where our own statute recognizes a mode of legitimation by acknowledgment by notarial act and subsequent marriage, (C. C. 219, Art. 1831, p. 86,) although the form in which it has been done in another State differs from our own./

In the case of, *Smith* v. *Kelly's Heirs*, 1 Cushman Mississippi Rep., 170, it ·was held by the very able bench which then presided in the Supreme Court of that State, that a child, illegitimate by the laws of South Carolina, where born and where his parents were subsequently married, could not inherit in Mississippi, although the child would have been legitimate in Mississippi, had he been born and the subsequent marriage of his parents taken place in that State.

In the case just cited, the maxim of the civil law was invoked, not to admit, but to *exclude*, the child from the inheritance, and as there was a marriage of the parents of the child, at most it only proves that the principle of the civil law is admitted in Mississippi, to apply to those cases where there has been a marriage recognized by the laws of another State.

But it seems to me, (conceding the statute to be personal,) it is against the policy of our law to enforce it to the exclusion of the heirs at law as regulated by the Civil Code. C. C. 882, 910, 224. Story Conflict Laws, 258. *Saul* v. *His Creditors*, 5 N. S. 597. The right of declaring who shall inherit immov- ) ables, has always been considered as belonging to the State where they are situated, and I question much if the comity of nations has yet been carried to the extent proposed in this case.

The Supreme Court of the United States says: "It is an acknowledged principle of law, that the title and disposition of real property is exclusively subject to the laws of the country where it is situated, which can alone prescribe the mode by which a title to it can pass from one person to another." *McCormick* v. *Sullivant*, 10 Wheaton, 192. See also 2 Burrows, 1079; 2 Peere Williams, 291; *Marcenaro* v. *Mordella*, 10 An.

Savigny, one of the most liberal writers of the present day, and one who has carried the law of the domicil to a greater length than any other writer with whom I am acquainted, finds it necessary to place a limit to its application. In substance, he says, in order that a personal statute should be enforced in another country, there should be something in common in the jurisprudence of the two countries in respect to the statute so sought to be en-/ forced.

He says, and I make a translation, though rough, yet nearly literal: "If a law relative to the personal condition (legal capacity) belongs to the absolute laws which, on account of their anomalous nature, lie outside of the common legal principles (Rechtsgemeinshaft) of independant States, the Judge does not apply the law of the domicil of the party, but the local law of the country to which he belongs.

SCOTT
*v.*
KEY.

"Where polygamy is allowed by law, he who is already married, has a capacity to take a second and a greater number of wives. The Judge of a Christian State would afford him no protection for this. In reference to this kind of legal capacity, the law of the former and not the law of the domicil will be applied.

"Where he to whom the law of his home denies a legal capacity as being a heretic, wishes to acquire rights and undertake business in a country where such a law in regard to heretics is rejected as immoral, and where perhaps the religion is the same as that of the so called heretic, the Judge should follow the law of his own country, and not that of the domicil of the person.

"If the law of one country declares Jews incapable of acquiring real estate, it binds foreign as well as resident Jews. The resident Jews, however, are not prevented thereby from acquiring land in another country which has no such law. In both these cases the law of the domicil of the person does not apply.

"The same may be said of the civil death of the French and Russian law. The magistrate of a State where the institution of the civil death is not adopted, will not make any application of it, nor observe the law of the domicil.

"The like rule prevails where the status of a negro slave is questioned in a country where the institution of slavery is not recognized." Savigny, German Ed., Berlin, 8 vol., Sec. 365, Art. 1, 2, 4, 6 and 7, p. 160, 165.

The principle recognized by Savigny, that personal statutes are only enforced where there is something found in common with them in the general laws of the country where they are sought to be enforced, has occurred to Mr. Parsons in his works on contracts. He says: "In regard to the first class, it is true that wherever the incapacitated person goes, he carries his incapacity with him: but this is perhaps not because his incapacity was created by a law of the home from which he came, for it was only recognized by that law; and being recognized by every other law, he finds himself under the same incapacity in every State, because he finds a similar law everywhere in force. For this law may well be called a law of nature; that is a law created by the Supreme Creator of, and law-giver for human nature, and as wide in its scope and operation as that nature." 2 Parsons on Contracts, 85.

A brief analysis of the statute in question, I think, will render it very far from clear that it is not a real instead of personal statute. The title of the act in common law countries, as I understand, is no part of the Act. 1 Wm. Black R., 95. We must therefore look to the body of the Act to see what it means.

It enacts that *William Estill*, the infant son of *Samuel Estill*, be made his legal heir and representive in as complete a manner as though he had been such from his birth. The maxim of the common law is *Nemo est haeres viventis.* Hence the Legislature of Arkansas did not intend to perform a legal impossibility when it declared that *William Estill* was the heir and representative of *Samuel Estill*, then living; it rather looked to his estate and provided a person who should inherit after his death his lands as heir, and succeed to his personal effects as his legal representative, than attempted to create a present personal relationship between the two.

In this view, the statute further provides that, "He (said *William*) shall be capable of inheriting the *estate* of said *Samuel Estill*, in as full and complete a manner as though said *Samuel Estill* had been married to his mother at the time of his birth; and the said *William* shall be known and called by the name of *William Estill*."

The second section provides that the Act shall take effect from its passage.

The Act confers upon *William* the right of inheriting from *Samuel Estill* as fully as he would have done if *Samuel* had been married to his mother, but it does not, I think, necessarily place *William* under the power and authority of *Samuel*, or create any personal relationship between them.

If the principle contended for in this case be once admitted, it is difficult to foresee where it will end.

I think because the statute of Arkansas has given *William Estill* the *status* of heir of *Samuel Estill*, we are obliged to declare him such in Louisiana, by the same reason we should have been obliged to recognize him as heir, if the Legislature of Arkansas had declared him heir to the exclusion of the legitimate children of *Samuel Estill*, and he had had legitimate children, for he would have had the so called *status* of heir which would have been wanting in the legitimate children. If the Legislature of Arkansas should designate a class of third persons or strangers to be the legitimate heirs of certain persons, would it not, by the same reasoning, be a personal statute, and would not the person declared heir have the *status*, and should we not be obliged to enforce it? If the statute of Arkansas should authorize one person to adopt as his heirs such persons as he pleased, and provide that the persons so adopted should be considered the heirs as fully as if born in wedlock, would it not also be as much a personal statute as the one before us? Would we enforce it to the exclusion of the heirs under our own law?

Suppose *Samuel Estill* had had three illegitimate children by different mothers, and two legitimate children, and the Legislature of Arkansas had declared the three illegitimate children should be considered heirs, how would this effect the legitime in Louisiana of the two legitimate children?

The child of the fourth wife of the Mohamedan, and the child perhaps of the thirtieth wife of the Mormon, have the *status* of legitimacy in their own countries; would our courts give effect to that *status* should such heirs present themselves here? These questions (arising from extreme cases it is true) show the difficulties which environ the application of the principle to the extent admitted by the majority of the court.

And I can see no safe rule except to consider those only as legitimate children, whose parents have at some time lived together as husband and wife. *Haeres et filius est quem nuptiæ demonstrant.* The Civil Code designated what persons shall inherit, and when a person presents himself who has not the qualities required by our law, except in an absolute fiction created by the statute of another State, my present impression is, that we should look at the *real facts* of the case, and give the inheritance to those entitled under our own laws.