WALTER H. ROSS *vs.* JOSEPH M. ROSS.

Hampden. Sept. 25, 1878. — Sept. 28, 1880. AMES & SOULE, JJ., absent

The status of any person, with the inherent capacity of succession or inheritance, is to be ascertained by the law of the domicil which creates the status, at least when the status is one which may exist under the laws of the State in which it is called in question, and when there is nothing in those laws to prevent giving full effect to the status and capacity acquired in the State of the domicil.

A child adopted, with the consent of its father and the sanction of a judicial decree, in another State, where the parties are domiciled at the time, under a statute by which a child so adopted has the same rights of inheritance as legitimate offspring in the estate of the adopting father, is entitled, after the adopting father and the adopted child have removed their domicil into this Commonwealth, to inherit here the real estate of such father as against his collateral heirs; although his wife has given no formal consent to the adoption, as is required under the statutes of adoption of this Commonwealth.

WRIT OF ENTRY brought by an infant, by his next friend, to recover a parcel of land in Springfield. The case was submitted to the Superior Court upon the following statement of facts:

In May 1871, and for several years previous, James M. Ross and Cynthia B. Ross resided in the county of Erie and State of Pennsylvania. On March 13, 1871, James M. Ross presented to the Court of Common Pleas for said county of Erie his petition representing "that he is desirous of adopting Walter H. Smith" (the present demandant), "an infant son, of the age of five months, of John Wesley Smith, and Mary Smith, now deceased, of said county, as one of his heirs, and for that purpose he herein declares his said desire, and also that he will perform all the duties of a parent to said Walter H. Smith;" and therefore praying the court to decree that said Walter H. Smith might assume his name, and have all the rights of a child and heir of said James M. Ross, and be subject to the duties of such child. The petition was signed and sworn to by James M. Ross, and was also signed by John Wesley Smith, the surviving parent of the child, for the purpose of giving his consent to such adoption. After due proceedings had upon the petition, that court, at May term 1871, as appears by its records, "being satisfied that the welfare of said minor, Walter H. Smith, will be promoted by the

adoption prayed for, and further that the surviving parent of said child consents to said adoption, ordered, adjudged and decreed that the said child shall assume the name Walter H. Ross, and have all the rights of a child and heir of the said James M. Ross, and be subject to all the duties of said child." At that time the statute of Pennsylvania of 1855, c. 456, which is copied in the margin,* was the law in force in that State relating to the adoption of children; and under the law of that State the demandant became the adopted child of James M. Ross.

Afterwards, in the year 1871, James M. Ross with his wife and the demandant came to reside in Springfield in this Commonwealth, and continued to reside in Springfield until May 1873, when James M. Ross died intestate, the owner in fee of the demanded premises, and leaving no other child than the demandant.

Both parties claim title to the demanded premises; the demandant as the child and heir of James M. Ross, and the tenant as brother of James M. Ross.

*Allen*, J. ruled *pro forma* that the demandant had not maintained his case; ordered judgment for the tenant; and reported the case to this court. If, upon this statement of facts, the demandant was not entitled to be recognized as a child and heir of

---

* That statute, after giving the Court of Common Pleas jurisdiction in certain matters, enacts, in § 7, that "it shall be lawful for any person desirous of adopting any child as his or her heir, or as one of his or her heirs, to present his or her petition to such court in the county where he or she may be resident, declaring such desire, and that he or she will perform all the duties of a parent to such child; and such court, if satisfied that the welfare of such child will be promoted by such adoption, may, with the consent of the parents or surviving parent of such child, or, if none, of the next friend of such child, or of the guardians or overseers of the poor, or of such charitable institution as shall have supported such child for at least one year, decree that such child shall assume the name of the adopting parent, and have all the rights of a child and heir of such adopting parent, and be subject to the duties of such child, of which the record of the court shall be sufficient evidence: Provided, that, if such adopting parent shall have other children, the adopted shall share the inheritance only as one of them in case of intestacy, and he, she or they shall respectively inherit from and through each other, as if all had been the lawful children of the same parent."

James M. Ross under the laws of this Commonwealth, the judgment was to stand; otherwise, judgment to be entered for the demandant.

*N. A. Leonard & G. Wells*, for the demandant.

*J. M. Ross, pro se.*

GRAY, C. J.   This case presents for adjudication the question which it was attempted to raise in *Ross* v. *Ross*, 123 Mass. 212, namely, whether a child adopted, with the sanction of a judicial decree, and with the consent of his father, by another person, in a State where the parties at the time have their domicil, under statutes substantially similar to our own, and which, like ours, give a child so adopted the same rights of succession and inheritance as legitimate offspring in the estate of the person adopting him, is entitled, after the adopting parent and the adopted child have removed their domicil into this Commonwealth, to inherit the real estate of such parent in this Commonwealth upon his dying here intestate.

The question how far a child, adopted according to law in the State of the domicil, can inherit lands in another State, was mentioned by Lord Brougham in *Doe* v. *Vardill*, 7 Cl. & Fin. 895, 898, and by Chief Justice Lowrie in *Smith* v. *Derr*, 34 Penn. St. 126, 128; but, so far as we are informed, has never been adjudged.   It must therefore be determined upon a consideration of general principles of jurisprudence, and of the judicial application of those principles in analogous cases.

As a general rule, when no rights of creditors intervene, the succession and disposition of personal property are regulated by the law of the owner's domicil.   It is often said, as in *Cutter* v. *Davenport*, 1 Pick. 81, 86, cited by the tenant, to be a settled principle, that "the title to and the disposition of real estate must be exclusively regulated by the law of the place in which it is situated."   But so general a statement, without explanation, is liable to mislead.   The question in that case was of the validity of an assignment of a mortgage of real estate; and there is no doubt that by our law the validity, as well as the form, of any instrument of transfer of real estate, whether a deed or a will, is to be determined by the *lex rei sitæ*.   *Goddard* v. *Sawyer*, 9 Allen, 78.   *Sedgwick* v. *Laflin*, 10 Allen, 430, 433.   *United States* v. *Crosby*, 7 Cranch, 115.   *Clark* v. *Graham*, 6 Wheat.

577.  *Kerr* v. *Moon*, 9 Wheat. 565.  *McCormick* v. *Sullivant*, 10 Wheat. 192.

It is a general principle, that the status or condition of a person, the relation in which he stands to another person, and by which he is qualified or made capable to take certain rights in that other's property, is fixed by the law of the domicil; and that this status and capacity are to be recognized and upheld in every other State, so far as they are not inconsistent with its own laws and policy.  Subject to this limitation, upon the death of any man, the status of those who claim succession or inheritance in his estate is to be ascertained by the law under which that status was acquired; his personal property is indeed to be distributed according to the law of his domicil at the time of his death, and his real estate descends according to the law of the place in which it is situated; but, in either case, it is according to those provisions of that law which regulate the succession or the inheritance of persons having such a status.

The capacity or qualification to inherit or succeed to property, which is an incident of the status or condition, requiring no action to give it effect, is to be distinguished from the capacity or competency to enter into contracts that confer rights upon others.  A capacity to take and have differs from a capacity to do and contract; in short, a capacity of holding from a capacity to act.  Generally speaking, the validity of a personal contract, even as regards the capacity of the party to make it, as in the case of a married woman or an infant, is to be determined by the law of the State in which it is made.  *Milliken* v. *Pratt*, 125 Mass. 374, and authorities cited.  *Polydore* v. *Prince*, 1 Ware, 402, 408–413.  *Bell* v. *Packard*, 69 Maine, 105.  *Bond* v. *Cummings*, 70 Maine, 125.  *Wright* v. *Remington*, 12 Vroom, 48.  Sir William Scott in *Dalrymple* v. *Dalrymple*, 2 Hagg. Consist. 54, 61.  Lord Brougham in *Warrender* v. *Warrender*, 2 Cl. & Fin. 488, 544; *S. C.* 9 Bligh N. R. 89, 120; 2 Sh. & Macl. 154, 214. *Simonin* v. *Mallac,* 2 Sw. & Tr. 67, 77.  *Sottomayer* v. *De Barros*, 5 P. D. 94, 100.  And the validity of any transfer of real estate by act of the owner, whether *inter vivos* or by will, is to be determined, even as regards the capacity of the grantor or testator, by the law of the State in which the land is situated.  Story Confl. §§ 431, 474.  But the status or condition of any person,

with the inherent capacity of succession or inheritance, is to be ascertained by the law of the domicil which creates the status, at least when the status is one which may exist under the laws of the State in which it is called in question, and when there is nothing in those laws to prohibit giving full effect to the status and capacity acquired in the State of the domicil.

A person, for instance, who has the status of child of another person in the country of his domicil, has the same status here, and as such takes such share of the father's personal property as the law of the domicil gives him, and such share of his real estate here as a child takes by the laws of this Commonwealth, unless excluded by some positive rule of our law. Inheritance is governed by the *lex rei sitæ;* but legitimacy is to be ascertained by the *lex domicilii.* If a man domiciled in England has two legitimate sons there, and dies intestate, owning land in this Commonwealth, both sons have the status of legitimate children here; but, by virtue of our statute of descents, the land descends to them equally, and not to the eldest son alone, as by the law of England.

If a marriage (in the proper sense of the term, not including Mormon or other polygamous marriages; *Hyde* v. *Hyde,* L. R. 1 P. & D. 130) is celebrated in one State, according to the form prescribed by its laws, between persons domiciled there, and competent to intermarry, it is universally admitted that the woman must be recognized everywhere as the lawful wife of the man, and entitled as such upon his death to such dower in his lands as the law of the State in which they are situated allows to a widow; although it is this law, and not the law of the domicil, which fixes the proportion that she shall take. *Ilderton* v. *Ilderton,* 2 H. Bl. 145. *Doe* v. *Vardill,* 2 Cl. & Fin. 571, 575, 576; *S. C.* 9 Bligh N. R. 32, 47, 48. *Potter* v. *Titcomb,* 22 Maine, 300. *Lamar* v. *Scott,* 3 Strob. 562. *Jones* v. *Gerock,* 6 Jones Eq. 190. Story Confl. §§ 159, 454.

Our law goes beyond this in recognizing the validity of foreign marriages, and holds that, the relation of husband and wife being a status based upon the contract of the parties, and recognized by all Christian nations, the validity of that contract, if not polygamous, nor incestuous according to the general opinion of Christendom, is governed, even as regards the competency of

the contracting parties, by the law of the place of the contract; that this status, once legally established, should be recognized everywhere as fully as if created by the law of the domicil; and therefore that any such marriage, valid by the law of the place where it is contracted, is, even if contracted between persons domiciled in this Commonwealth and incompetent to marry here under our laws, (except so far as the Legislature has clearly enacted that such marriages out of the Commonwealth shall be deemed void here,) valid here to all intents and effects, civil or criminal, including the settlement of the wife and children, her right of dower, and their legitimacy and capacity to inherit the father's real estate. Parsons, C. J. in *Greenwood* v. *Curtis*, 6 Mass. 358, 377–379. *Medway* v. *Needham*, 16 Mass. 157. *West Cambridge* v. *Lexington*, 1 Pick. 506. *Putnam* v. *Putnam*, 8 Pick. 433. *Commonwealth* v. *Lane*, 113 Mass. 458. *Bullock* v. *Bullock*, 122 Mass. 3. *Milliken* v. *Pratt*, 125 Mass. 380, 381.

As to foreign divorces, it is well settled in this Commonwealth, that a decree of divorce rendered in another State, in which the legal domicil of the parties is at the time, and according to its laws, even for a cause which is not a ground of divorce by our laws, and although their marriage took place while they were domiciled in this Commonwealth, is valid here, and conclusive in a suit concerning the husband's interest or the wife's dower in lands in this Commonwealth. *Barber* v. *Root*, 10 Mass. 260. *Clark* v. *Clark*, 8 Cush. 385. *Hood* v. *Hood*, 11 Allen, 196. *Hood* v. *Hood*, 110 Mass. 463. *Burlen* v. *Shannon*, 115 Mass. 438. *Sewall* v. *Sewall*, 122 Mass. 156. The provision of the existing statutes, affirming the validity of foreign divorces, made no change in the law; but, in the words of the Commissioners upon whose advice it was first enacted, "is founded on the rule established by the comity of all civilized nations; and is proposed merely that no doubt should arise on a question so interesting and important as this may sometimes be." Rev. Sts. c. 76, § 40, and note of Commissioners. Gen. Sts. c. 107, § 55. The leading case of *Barber* v. *Root*, above cited, arose and was determined before the enactment of this provision. And in England, since the establishment of a court vested with power to grant divorces from the bond of matrimony, the tendency of the judges is to recognize the validity of a foreign divorce between English

persons married in England, but domiciled in good faith at the time of the divorce in the foreign State, at least for a cause which would be a cause of divorce in England. See Dicey on Domicil, 234–237, 353–355 ; *Harvey* v. *Farnie*, 5 P. D. 153.

Another class of cases requires more particular examination. By the rule of the common law, which is the law of England to this day, and formerly prevailed throughout the United States, a child not born in lawful matrimony is not deemed the child of his father, although the parents subsequently intermarry, but is indelibly a bastard. By the rule of the civil law, on the other hand, which has been adopted in Scotland, as well as in France, Germany, and other parts of Europe, and more recently in many States of the Union, such a child may become legitimate upon the subsequent marriage of his parents.

The leading case in Great Britain on this subject is *Shedden* v. *Patrick*, briefly reported in Morison's Dict. Dec. Foreign, Appx. I. No. 6, and more fully in 5 Paton, 194, which was decided by the House of Lords, on appeal from the Scotch Court of Session, in 1808, and in which a Scotchman, owning land in Scotland, became domiciled in New York, and there cohabited with an American woman, had a son by her, and afterwards married her, and died there ; and the son was held not entitled to inherit his land in Scotland. Two questions were argued : 1st. Whether the plaintiff, being by the law of the country where he was born, and where his parents were domiciled at the time of his birth and of their subsequent marriage, a bastard and not made legitimate by such marriage, could inherit as a legitimate son in Scotland, the law of which allows legitimation by subsequent matrimony. 2d. Whether, being a bastard, and therefore *nullius filius* at the time of his birth in America, he was an alien and therefore incapable of inheriting land in Great Britain ; the act of Parliament of 4 Geo. II. *c.* 21, making only those children, born out of the ligeance of the British crown, natural-born subjects, whose fathers were such subjects " at the time of the birth of such children respectively." The Court of Session decided the case upon the first ground. In the House of Lords, after full argument of both questions by Fletcher and Brougham for the appellant and by Romilly and Nolan for the respondent, Lord Chancellor Eldon, speaking for himself and Lord Redesdale,

said that, "as it was not usual to state any reasons for affirming the judgment of the court below, he should merely observe that the decision in this case would not be a precedent for any other which was not precisely the same in all its circumstances," and thereupon moved that the judgment of the Court of Session should be affirmed, which was accordingly ordered. On a suit brought forty years afterwards by the same plaintiff against the same defendant to set aside that judgment for fraud in procuring it, the House of Lords in 1854, without discussing the first point except so far as it bore upon the question whether there had been any fraudulent suppression of facts relating to the father's domicil, held that the plaintiff was an alien at the time of his birth, and could not be afterward naturalized except by act of Parliament. *Shedden* v. *Patrick*, 1 Macq. 535.

But the remark of Lord Eldon, above quoted, in moving judgment in the original case, and the statements made in subsequent cases by him, by Lord Redesdale, who concurred in that judgment, and by Lord Brougham, who was of counsel in that case, clearly show that the judgment in the House of Lords, as well as in the Court of Session, went upon the ground that the child was illegitimate because the law of the foreign country, in which the father was domiciled at the time of the birth of the child and of the subsequent marriage of the parents, did not allow legitimation by subsequent matrimony. Lord Eldon's judgment in the *Strathmore Peerage Case*, 4 Wils. & Sh. Appx. 89–91, 95; *S. C.* 6 Paton, 645, 656, 657, 662. Lord Redesdale's judgment in *S. C.* 4 Wils. & Sh. Appx. 93, 94, and 6 Paton, 660, 661; expounded by Lord Lyndhurst, in the presence and with the concurrence of Lord Eldon, in *Rose* v. *Ross*, 4 Wils. & Sh. 289, 295–297, 299; *S. C. nom. Munro* v. *Saunders*, 6 Bligh N. R. 468, 472–475, 478. Lord Brougham in *Doe* v. *Vardill*, 2 Cl. & Fin. 571, 587, 592, 595, 600; *S. C.* 9 Bligh N. R. 32, 75, 80, 83; in *Munro* v. *Munro*, 7 Cl. & Fin. 842, 885; *S. C.* 1 Robinson H. L. 492, 615; and in *Shedden* v. *Patrick*, 1 Macq. 622.

That decision is wholly inconsistent with the theory that upon general principles, independently of any positive rule of law, the question whether a person claiming an inheritance in real estate is the lawful child of the last owner is to be determined by the *lex rei sitæ*; for, if that law had been applicable to that question

the plaintiff must have been held to be the legitimate heir; and it was only by trying that question by the law of the domicil of his father that he was held to be illegitimate. The decision receives additional interest and weight from the fact that the case for the appellant (which is printed in 1 Macq. 539–552) was drawn up by Mr. Brougham, then a member of the Scotch bar, and contained a very able statement of reasons why the *lex rei sitæ* should govern.

In later cases in the House of Lords, like questions have been determined by the application of the same test of the law of the domicil. In the case of the *Strathmore Peerage*, above cited, which was what is commonly called a Scotch peerage, having been such a peerage before the union of the two kingdoms, the last peer was domiciled in England, had an illegitimate son there by an Englishwoman, and married her in England; and it was held that by force of the law of England the son did not inherit the peerage. So in *Rose* v. *Ross*, above cited, where a Scotchman by birth became domiciled in England, and had a son there by an Englishwoman, and afterwards went to Scotland with the mother and son, and married her there, retaining his domicil in England, and then returned with them to England and died there, it was held that the son could not inherit the lands of the father in Scotland, because the domicil of the father, at the time of the birth of the child and of the subsequent marriage, was in England. On the other hand, where a Scotchman, domiciled in Scotland, has an illegitimate son born in England, and afterwards marries the mother, either in England, whether in the Scotch or in the English form, or in Scotland, the son inherits the father's land in Scotland, because, the father's domicil being throughout in Scotland, the place of the birth or marriage is immaterial. *Dalhousie* v. *McDouall*, 7 Cl. & Fin. 817; *S. C.* 1 Robinson H. L. 475. *Munro* v. *Munro*, 7 Cl. & Fin. 842; *S. C.* 1 Robinson H. L. 492. *Aikman* v. *Aikman*, 3 Macq. 854. *Udny* v. *Udny*, L. R. 1 H. L. Sc. 441.

In the well known case of *Doe dem. Birtwhistle* v. *Vardill*, it was indeed held by the Court of King's Bench in the first instance, and by the House of Lords on writ of error, after two arguments, at each of which the judges attended and delivered an opinion, that a person born in Scotland, and there legitimate

by reason of the subsequent marriage of his parents in Scotland, they having had their domicil there at the time of the birth and of the marriage, could not inherit land in England.  5 B. & C. 438; 8 D. & R. 185.   2 Cl. & Fin. 571; 9 Bligh N. R. 32, 7 Cl. & Fin. 895 ; 6 Bing. N. C. 385 ; 1 Scott N. R. 828 , West H. L. 500.

One curious circumstance connected with that case is, that, under the English usage which allows counsel in a cause, if raised to the bench during its progress, to sit as judges in it, Chief Justice Tindal, who had argued the case for the plaintiff in the King's Bench, gave the opinion of the judges in the House of Lords in accordance with which judgment was finally rendered for the defendant; and Lord Brougham, who had taken part as counsel for the defendant in the first argument in the House of Lords, was most reluctant, for reasons which he stated with characteristic fulness and power, to concur in that judgment. 5 B. & C. 440.   2 Cl. & Fin. 582–598.   7 Cl. & Fin. 924, 940–957.

But that case, as clearly appears by the opinions of Chief Justice Abbott and his associates in the King's Bench, as well as by that of the judges, delivered by Chief Justice Tindal, and those of Lord Brougham and Lord Cottenham, after the rehearing in the House of Lords, was decided upon the ground that, admitting that the plaintiff must be deemed the legitimate son of his father, yet, by what is commonly called the Statute of Merton, 20 Hen. III. c. 9, the Parliament of England, at a time when the English Crown had possessions on the Continent in which legitimation by subsequent matrimony prevailed, had, although urged by the bishops to adopt the rule of the civil and canon law, by which children born before the marriage of their parents are equally legitimate as to the succession of inheritance with those born after marriage, positively refused to change the law of England as theretofore used and approved.   The ratio decidendi is most clearly brought out by Mr. Justice Littledale and by Chief Justice Tindal.

Mr. Justice Littledale said : " One general rule applicable to every course of descent is, that the heir must be born in lawful matrimony.   That was settled by the Statute of Merton, and we cannot allow the comity of nations to prevail against it.   The

very rule that a personal status accompanies a man everywhere is admitted to have this qualification, that it does not militate against the law of the country where the consequences of that status are sought to be enforced. Here it would militate against our statute law to give effect to that status of legitimacy acquired by the lessor of the plaintiff in Scotland. He cannot, therefore, be received as legitimate heir to land in England." 5 B. & C. 455.

Upon the first argument in the House of Lords, Chief Baron Alexander, adopting the sentiment and the language of Sir William Scott in *Dalrymple* v. *Dalrymple*, 2 Hagg. Consist. 58, 59, " varied only so far as to apply to a question of legitimacy what was said of a question respecting the validity of a marriage," said, in the name of all the judges who attended at that argument, " The cause being entertained in an English court must be adjudicated according to the principles of English law applicable to such a case; but the only principle applicable to such a case by the law of England is, that the status or condition of the claimant must be tried by reference to the law of the country where the status originated; having furnished this principle, the law of England withdraws altogether, and leaves the question of status in the case put to the law of Scotland." The learned Chief Baron added, " The comity between nations is conclusive to give to the claimant the character of the eldest legitimate son of his father, and to give him all the rights which are necessarily consequent upon that character." 2 Cl. & Fin. 573-575. The grounds upon which, notwithstanding this, he undertook, without alluding to the Statute of Merton and the practice under it, to maintain that, by the rules of inheritance and descent which the law of England had impressed upon all land in England, the plaintiff could not recover, were so unsatisfactory to the Lords, that Lord Brougham, at that stage of the case, declared that he entertained a very strong opinion that the case. was wrongly decided in the court below, and Lord Lyndhurst and Lord Denman concurred in his motion that the case should be reargued. 2 Cl. & Fin. 598-600.

In delivering the opinion of the judges after the second argument Chief Justice Tindal said : " The grounds and foundation upon which our opinion rests are briefly these : That we hold it

to be a rule or maxim of the law of England with respect to the descent of land in England from father to son, that the son must be born after actual marriage between his father and mother; that this is a rule *juris positivi*, as are all the laws which regulate succession to real property, this particular rule having been framed for the direct purpose of excluding, in the descent of land in England, the application of the rule of the civil and canon law, by which the subsequent marriage between the father and mother was held to make the son born before marriage legitimate; and that this rule of descent, being a rule of positive law annexed to the land itself, cannot be allowed to be broken in upon or disturbed by the law of the country where the claimant was born, and which may be allowed to govern his personal status as to legitimacy, upon the supposed ground of the comity of nations."   7 Cl. & Fin. 925.

The Chief Justice then proceeded to make an elaborate statement of the provisions of the Statute of Merton, and of the circumstances under which it was passed, particularly dwelling upon the facts that at the time of its passage Normandy, Aquitaine and Anjou were under the allegiance of the King of England, and those born in those dominions were natural-born subjects and could inherit land in England, and that many of the peers who attended appeared to have been of foreign lineage if not of foreign birth, and were, at all events, well acquainted with the rule of law which was then so strongly contested, " yet, notwithstanding the rule of the civil and canon law prevailed in Normandy, Aquitaine and Anjou, by which the subsequent marriage makes the *antenatus* legitimate for all purposes and to all intents ; and notwithstanding the precise question then under discussion was whether this rule should govern the descent of land locally situate in England, or whether the old law and custom of England should still continue as to such land, under which the *antenatus* was incapable to take land by descent; there is not the slightest allusion to any exception in the rule itself as to those born in the foreign dominions of the Crown, but the language of the rule is, in its terms, general and universal as to the succession to land in England."   And he fortified his position that no such exception was intended, by referring to the forms of writs before and after the passage of the statute,

and to Glanville, Bracton and other early authorities. 7 Cl. & Fin. 926–933.

It was upon the " very great new light " thus thrown upon the question, and the " very important additions " thus made to the former arguments, that Lord Brougham, though not wholly convinced, waived his objections to judgment for the defendant. 7 Cl. & Fin. 939, 943–946, 956. And Lord Cottenham, the only other law lord present, in moving that judgment, said, " I am extremely satisfied with the ground upon which the judges put it, because they put the question on a ground which avoids the difficulty that seems to surround the task of interfering with those general principles peculiar to the law of England, principles that at first sight seem to be somewhat at variance with the decisions to which the courts have come." 7 Cl. & Fin. 957. And see Lord Brougham, Lord Cranworth and Lord Wensleydale, in *Fenton* v. *Livingstone*, 3 Macq. 497, 532, 544, 550.

In the case of *Don's Estate*, 4 Drewry, 194, Vice Chancellor Kindersley declared that the general principle was that " the legitimacy or illegitimacy of any individual is to be determined by the law of that country which is the country of his origin ; if he is legitimate in his own country, then all other countries, at least all Christian countries, recognize him as legitimate everywhere ; " and that the ground of the decision in *Doe* v. *Vardill* was, that, admitting the personal status of legitimacy, the law of England attached to land certain rules of inheritance which could not be departed from. And he therefore held that, assuming that a son born in Scotland before the marriage of his parents domiciled there, and there legitimate in consequence of their subsequent marriage, was legitimate all over the world, at any rate in England, yet, as he could not inherit land in England from his father or from any other person, so no other person could succeed to him by inheritance except his own issue.

So in *Shaw* v. *Gould*, L. R. 3 H. L. 55, 70, Lord Cranworth said of *Doe* v. *Vardill* : " The opinions of the judges in that case, and of the noble lords who spoke in the House, left untouched the question of legitimacy, except so far as it was connected with succession to real estate. I think they inclined to the opinion that for purposes other than succession to real estate, for purposes unaffected by the Statute of Merton, the law of the domicil

would decide the question of status. No such decision was come to, for no question arose except in relation to heirship to real estate. But the opinions given in the case seem to me to show a strong bias towards the doctrine that the question of status must, for all purposes unaffected by the feudal law, as adopted and acted on in this country, be decided by the law of the domicil."

In *Skottowe* v. *Young*, L. R. 11 Eq. 474, the proceeds of lands in England were devised by a British subject domiciled in France, in trust to sell and to pay the proceeds to his daughters born of a Frenchwoman before marriage, but afterwards legitimated according to the law of France; and it was held by Vice Chancellor Stuart, in accordance with a previous dictum of Lord Chancellor Cranworth, in *Wallace* v. *Attorney General*, L. R. 1 Ch. 1, 8, that the daughters were not "strangers in blood," within the meaning of the English legacy duty act. The Vice Chancellor observed that in *Doe* v. *Vardill* the claimant was admitted to have in England the status of the eldest legitimate son of his father, and failed in his suit only because he could not prove that he was heir according to the law of England in which the land was; that this will was that of a domiciled Frenchman, and his status and that of his children must be their status according to the law of France, which, according to *Doe* v. *Vardill*, constituted their English status; and that "the status of these ladies being that of daughters legitimated according to the law of France by a declaration of the father, it is impossible to hold that they are for any purpose strangers in blood, on the mere ground that, if they had been English, and their father domiciled in England, they would have been illegitimate."

It may require grave consideration, when the question shall arise, whether the legitimacy of a child, depending upon marriage of its parents or other act of acknowledgment after its birth, should not be determined by the law of the domicil at the time of the act which effects the legitimation, rather than by the law of the domicil at the time of the birth, or even of the marriage, when some other acknowledgment is necessary. See Sir Samuel Romilly's argument in *Shedden* v. *Patrick*, 5 Paton, 205; printed more at length in 1 Macq. 556–558; Lord Brougham in *Munro* v. *Munro*, 7 Cl. & Fin. 882; *S. C.* 1 Robinson H. L. 612;

Lord St. Leonards in *Shedden* v. *Patrick*, 1 Macq. 641; *Stevenson* v. *Sullivant*, 5 Wheat. 207, 259; 2 Toullier Droit Civil (5th ed.) 217; Savigny's Private International Law, § 380; (Guthrie's ed.) 250 and note, 260.

These authorities do not appear to have been considered in those English cases, in which, under a bequest in an English will to " the children " of an Englishman who afterwards became domiciled in a foreign country, and there married the mother of his illegitimate children born there, whereby they became legitimate by the law of that country, Vice Chancellor Wood (afterwards Lord Hatherley) and Vice Chancellor Stuart were of opinion that those children born before the change of domicil could not take, and differed upon the question whether those born after the change could take, Vice Chancellor Stuart holding that they could, and Vice Chancellor Wood holding that they could not. *Wright's Trust*, 2 K. & J. 595; *S. C.* 25 L. J. (N. S.) Ch. 621; 2 Jur. (N. S.) 465. *Goodman* v. *Goodman*, 3 Giff. 643. *Boyes* v. *Bedale*, 1 Hem. & Mil. 798. Lord Hatherley in *Udny* v. *Udny*, L. R. 1 H. L. Sc. 441, 447. See also Kindersley, V. C. in *Wilson's Trusts*, L. R. 1 Eq. 247, 264–266; Lord Chelmsford in *S. C. nom. Shaw* v. *Gould*, L. R. 3 H. L. 55, 80. But those opinions proceeded upon the construction of wills of persons domiciled in England; and Vice Chancellor Wood appears to have admitted that if the father had never been domiciled in England the rule would have been different. *Wright's Trust*, 25 L. J. (N. S.) Ch. 632; *S. C.* 2 Jur. (N. S.) 472; citing *Ashford* v. *Tustin*, before Parker, V. C., reported only in Lovell's Monthly Digest, 1852, p. 389. *Udny* v. *Udny*, L. R. 1 H. L. Sc. 448.

The dictum of Vice Chancellor Wood in *Boyes* v. *Bedale*, 1 Hem. & Mil. 805, and the decision of Sir George Jessel, M. R., in the case of *Goodman's Trusts*, 14 Ch. D. 619, that the word " children " in the English statute of distributions means only children according to the law of England, and that therefore children born in a foreign country, and legitimated by the law of that country upon the subsequent marriage of their parents there, could not take by representation under that statute as children of their father, although he was domiciled in that country at the time of their birth and of the subsequent marriage, can hardly, as it seems to us, be reconciled with the general

current of judicial opinion in England, as shown by the cases already referred to.

The most accomplished commentators on the subject, English and American, are agreed that the decision in *Doe* v. *Vardill*, which has had so great an influence with English judges, does not rest upon general principles of jurisprudence, but upon historical, political and constitutional reasons peculiar to England. Westlake's Private International Law (ed. 1858) §§ 90–93; (ed. 1880) intro. 9, §§ 53, 168. 4 Phillimore's International Law (2d ed.) § 538 note. Dicey on Domicil, 182, 188, 191, pref. iv. 2 Kent Com. 117 note *a*, 209 note *a*. 4 Kent Com. 413 note *d*. Story Confl. §§ 87, 87 *a* and note, 93 *i*, 93 *m*. Redfield, in Story Confl. § 93 *w* and note. Whart. Confl. § 242. Upon questions of comity of States, considerations derived from the feudal law, from an act of Parliament of the time of Henry III. and from the constitution and policy of the English government, have no weight in Massachusetts at the present day.

Almost fifty years ago, the Legislature of this Commonwealth enacted that children born before the marriage of their parents and acknowledged by their father afterwards, and legitimate children of the same parents, should inherit from each other as if all had been born in lawful wedlock; but did not make such illegitimate children capable of inheriting from their father. St. 1832, *c.* 147. Whether this was accidental or designed, the Commissioners on the revision of the statutes in 1835 reported to the Legislature that they had no means to conjecture, not knowing the reasons on which the statute itself was founded, "the whole of it being an innovation upon the law as immemorially practised and transmitted to us by our ancestors;" and therefore proposed a section making no change in this respect, but only expressing what they supposed to have been the intention of the framers of that statute; "leaving it to the wisdom of the Legislature, if they should think fit to continue this law in force, to modify it in such manner as shall be thought proper." Report of Commissioners on Rev. Sts. *c.* 61, § 4 and note.

The Legislature solved the doubt of the learned Commissioners by making the statute more comprehensive, and enacting it in this form: "When, after the birth of an illegitimate child, his parents shall intermarry, and his father shall, after the marriage,

acknowledge him as his child, such child shall be considered as legitimate to all intents and purposes, except that he shall not be allowed to claim, as representing either of his parents, any part of the estate of any of their kindred, either lineal or collateral." Rev. Sts. *c.* 61, § 4.

In *Loring* v. *Thorndike*, 5 Allen, 257, a testator domiciled in this Commonwealth, by a will admitted to probate before the Revised Statutes were passed, bequeathed a sum in trust to pay the income to his son for life, and the principal at his death " to his lawful heirs." After the Revised Statutes took effect, the son, whose domicil also was and continued to be in this Commonwealth, had two illegitimate children in Germany by a German woman, and afterwards married her there in a form authorized by the law of the place, and there acknowledged them as his children. This court held that by the Rev. Sts. *c.* 61, § 4, such children must be deemed legitimate for all purposes, except of taking by inheritance as representing one of the parents any part of the estate of the kindred, lineal or collateral, of such parent; and that the children took directly under the will of their grandfather, and not as the representatives of their father, and were therefore not within the exception of the statute, but were entitled to the benefit of the bequest.

Still greater changes in the rules of the law of England as to the descent of real estate have been made by subsequent legislation in this Commonwealth. Aliens, whether residing here or abroad, may take, hold, convey and transmit real estate. St. 1852, *c.* 29. Gen. Sts. *c.* 90, § 38. *Lumb* v. *Jenkins*, 100 Mass. 527. And if the parents of an illegitimate child marry, and the father acknowledges him as his child, the child is to be deemed legitimate for all purposes whatsoever, whether of inheritance or settlement or otherwise. St. 1853, *c.* 253. Gen. Sts. *c.* 91, § 4. *Monson* v. *Palmer*, 8 Allen, 551. The statutes of adoption will be referred to hereafter.

In *Smith* v. *Kelly*, 23 Miss. 167, it was held that the status or condition of a person as to legitimacy must be determined by reference to the law of the country where such status or condition had its origin, and that the status so ascertained adhered to him everywhere; and therefore that where, at the time of the birth of an illegitimate child and of the subsequent marriage

of its parents, they were domiciled in South Carolina, in which such marriage did not make the child legitimate, and afterwards removed with the child to Mississippi, by the law of which State subsequent marriage of the parents and acknowledgment of the .child by the father would legitimate it, and the child was always recognized by the father as his child, yet the child, having had the status of illegitimacy in South Carolina, retained that status in Mississippi, and could not inherit or succeed to either real or personal property in Mississippi. That decision is a strong application of the law of the domicil of origin, and per haps did not give sufficient effect to the father's recognition of the child in Mississippi after they had established their domicil in that State.

In *Scott* v. *Key*, 11 La. Ann. 232, while a father and his illegitimate son, whose mother he never married, were domiciled in the Territory of Arkansas, the Legislature of that Territory passed a special statute enacting that the son should be made his father's legal heir and representative in as complete a manner as though he had been such from his birth, and should be as capable of inheriting his father's estate in a full and complete manner, as if his father has been married to his mother at the time of his birth, and should be known and called by his father's name; and the father and son afterwards removed to Louisiana. The majority of the court held that the heritable quality of legitimacy, which the son had received from the Legislature of the State of his residence, accompanied him when he changed · his domicil, and that he was entitled to inherit his father's immovable property in Louisiana, to the exclusion of the father's brothers and sisters. Chief Justice Merrick dissented, but only upon the ground that to allow such an act to have an extra-territorial effect would be to allow another State to provide a new class of heirs for immovables and successions in Louisiana; and that, in order that personal statutes should be enforced in another country, there must be something in common between the juris-prudence of the two countries; and, speaking of the conflicting rules of the civil law and the common law in regard to legitima-tion by subsequent matrimony, said, " The doctrine of the civil law ought to be enforced, doubtless, in those cases where our own statute recognizes a mode .of legitimation by acknowledgment

by notarial act and subsequent marriage, although the form in which it has been done in another State differs from our own." 11 La. Ann. 239. And see 4 Phillimore, § 542; Savigny (Guthrie's ed.) 258, 260, 264 and note.

In *Barnum* v. *Barnum*, 42 Md. 251, on the other hand, it was said, in the opinion of the majority of the court, that a special statute of the Legislature of Arkansas, enacting that one person be constituted the heir of another, both of whom had a domicil there, making no reference to any marriage, and not even depending on the one being the child of the other, could have no extraterritorial operation whatever. See pp. 305, 307, 325. But the point decided was, that the former was not an "heir" of the latter, within the meaning of the will of the latter's father, who, nine years before the passage of the Arkansas statute, died domiciled in Maryland, the law of which does not appear to have permitted the creation of an heir in that manner.

The cases on this topic in other States, so far as they have come to our notice, afford little assistance. The decision in *Smith* v. *Derr*, 34 Penn. St. 126, that a child born out of wedlock, and legitimated by the law of another State where the father and child were domiciled, could not inherit land in Pennsylvania in 1855, was, as the court said, covered by the principle decided in *Doe* v. *Vardill;* for the Statute of Merton was then in force in Pennsylvania, although since repealed there. See Report of the Judges, 3 Binn. 595, 600; Purd. Dig. (10th ed.) 1004. The decision in *Harvey* v. *Ball*, 32 Ind. 98, allowing a bastard child of parents who at the time of its birth and of their subsequent intermarriage, and until their death, had their domicil in Pennsylvania, to inherit land in Indiana under a statute of Indiana enacting that "if any man shall marry a woman who has, previous to the marriage, borne an illegitimate child, and after marriage shall acknowledge such child as his own, such child shall be deemed legitimate to all intents and purposes," was put exclusively upon the meaning attributed by the court to that statute, without regard to general principles or cases decided elsewhere; and upon any other ground would be inconsistent with the decision in the leading case of *Shedden* v. *Patrick*, before cited. In *Lingen* v. *Lingen*, 45 Ala. 410, in which it was held that a child, born in France of parents who never

intermarried, and there acknowledged by his father according to the forms of the French law, and so made legitimate by that law, could not take a share in the father's estate in Alabama, the father's domicil was always in Alabama, and the child had not been legitimated in any manner allowed by the laws of that State.

The legal adoption by one person of the offspring of another, giving him the status of a child and heir of the parent by adoption, was unknown to the law of England or of Scotland, but was recognized by the Roman law, and exists in many countries on the continent of Europe which derive their jurisprudence from that law. Co. Lit. 7 *b*, 237 *b*. 4 Phillimore, § 531. Mackenzie's Roman Law, 120–124. Whart. Confl. § 251. It was long ago introduced, from the law of France or of Spain, into Louisiana and Texas, and more recently, at various times and by different statutes, throughout New England, and in New York, New Jersey, Pennsylvania, and a large proportion of the other States of the Union. *Fuselier* v. *Masse*, 4 La. 423. *Vidal* v. *Commagère*, 13 La. Ann. 516. *Teal* v. *Sevier*, 26 Tex. 516. Miss. St. 1846; Hutch. Miss. Code, 501. Alabama Code of 1852, § 2011. N. Y. St. 1873, *c.* 830. N. J. Rev. Sts. of 1877, § 1345. Penn. St. 1855, *c.* 456; Purd. Dig. 61. 1 Southern Law Rev. (N. S.) 70, 79 and note, citing statutes of other States. One of the first, if not the very first, of the States whose jurisprudence is based exclusively on the common law, to introduce it, was Massachusetts.

By the St. of 1851, *c.* 324, upon the petition of any inhabitant of this Commonwealth, and of his wife, if he was a married man, for leave to adopt a child not his own by birth, with the consent in writing of its parents, or the survivor of them, or, if neither should be living, of the child's legal guardian, next of kin or next friend, and the consent of the child also if of the age of fourteen years or upwards, the judge of probate of the county in which the petitioner resided, upon being satisfied that the petitioner, or, in case of husband and wife, the petitioners, were of sufficient ability to bring up the child and furnish it with suitable nurture and education, and that it was fit and proper that such adoption should take effect, was authorized to decree that the child should be deemed and taken to be, to all legal intents and purposes, the child of the petitioner or petitioners;

and the child so adopted was thereafter to be deemed, for the purposes of inheritance and succession by such child, custody of his person, duty of obedience to such parents or parent by adoption, and all other legal consequences and incidents of the natural relation of parents and children, the same as if he had been born of such parents or parent by adoption in lawful wedlock, saving only that he should not be capable of taking property expressly limited to the heirs of the body of the petitioner or petitioners. St. 1851, *c.* 324, §§ 1–6. And by the St. of 1854, *c.* 24, the petitioner was authorized to have the name of the child changed at the same time. These provisions were substantially reënacted in 1860, and again in 1871, with a further exception that the adopted child should not be capable of taking property from the lineal or collateral kindred of such parents by the right of representation. Gen. Sts. *c.* 110, §§ 1–8, 13. St. 1871, *c.* 310.

The statute of Pennsylvania of 1855, which is made part of the case stated, and under which the demandant was adopted by the intestate in 1871, while both were domiciled in that State, corresponds to these statutes of this Commonwealth in most respects. Like them, it permits any inhabitant of the State to petition for leave to adopt a child; it requires the petition to be presented to a court in the county where the petitioner resides; it requires the consent of the parents or surviving parent of the child; it authorizes the court, upon being satisfied that it is fit and proper that such adoption should take effect, to decree that the child shall assume the name, and have all the rights and duties of a child and heir, of the adopting parent; and it makes the record of that decree evidence of that fact.

The statute of Pennsylvania differs from our own only in not requiring the consent of the petitioner's wife, and of the child if more than fourteen years of age; in omitting the words "as if born in lawful wedlock" in defining the effect of the adoption; in also omitting any exception to the adopted child's capacity of inheriting from the adopting parent; and in expressly providing that, if the adopting parent has other children, the adopted child shall share the inheritance with them in case of intestacy, and he and they shall inherit through each other as if all had been lawful children of the same parent.

In *Commonwealth* v. *Nancrede*, 32 Penn. St. 389, it was held that a child adopted under the act of 1855, and to whom the adopting father had devised and bequeathed all his estate, was not exempt from the collateral inheritance tax under an earlier statute of that State; and Chief Justice Lowrie said: "It is property devised or descending to children or lineal descendants that is exempt from the tax. If the heirs or devisees are so in fact, they are exempt; all others are subject to the tax. Giving an adopted son a right to inherit does not make him a son in fact. And he is so regarded in law, only to give the right to inherit, and not to change the collateral inheritance tax law. As against that law, he has no higher merit than collateral blood relations of the deceased, and is not at all to be regarded as a son in fact." The scope and meaning of that decision appear more clearly by referring to the terms of the earlier statute, which imposed such a tax on all estates passing from any person dying seised thereof, either testate or intestate, to any person other than the "father, mother, husband, wife, children and lineal descendants born in lawful wedlock." Purd. Dig. 214, 215. The whole effect of the decision therefore was, that a child adopted under the act of 1855 was not exempt from the tax, because he was not a "child born in lawful wedlock," or, in the words of the Chief Justice, not "a son in fact."

In *Schafer* v. *Eneu*, 54 Penn. St. 304, a testator, who died before the passage of the adoption act of 1855, devised property in trust for the sole and separate use of his daughter for life, and on her death to be conveyed to her children and the heirs of her children forever, and made a residuary devise to his own children, by name, in fee; the daughter afterwards adopted three children under the act of 1855, and died leaving no other children; and it was held that the estate devised went to the children of the testator, and not to the adopted children of the daughter. Mr. Justice Strong, in delivering judgment, referred to *Commonwealth* v. *Nancrede*, above cited, and said: "Adopted children are not children of the person by whom they have been adopted, and the act of Assembly does not attempt the impossibility of making them such." "The right to inherit from the adopting parent is made complete, but the identity of

the child is not changed. One adopted has the rights of a child without being a child." And he added that the testator's own children had a vested interest under his will, when the act of 1855 was passed, which it was not in the power of the Legislature to take away.

We are not required, and are hardly authorized, for the purposes of the present case, to consider whether the first of these decisions can be reconciled in principle with that of Vice Chancellor Stuart in *Skottowe* v. *Young*, L. R. 11 Eq. 474, above referred to, or the second with those of this court in *Sewall* v. *Roberts*, 115 Mass. 262, and *Loring* v. *Thorndike*, 5 Allen, 257. We assume them to establish conclusively that by the law of Pennsylvania a child adopted by a man under the act of 1855, not being a child born to him in wedlock, is not his child, within the terms of the collateral inheritance tax act of that State, nor within the meaning of the will of a third person, domiciled in that State, who died before adoption had any legal existence there.

But the opinion in each of those cases clearly recognizes, what is indeed expressly enacted in the statute, that, as between the adopted child and the adopting father, the child has all the rights and duties of a child, and the capacity to inherit as such. According to one of the most learned and thoughtful writers on jurisprudence of our time, it is the rights, duties and capacities, arising from the event which creates a particular status, that constitute the status itself and afford the best definition of it. 2 Austin on Jurisprudence (3d ed.) 706, 709–712, 974. By the law of Pennsylvania, therefore, as enacted by its Legislature and expounded by its highest judicial tribunal, the demandant, as between him and his adopting father, has in all respects the legal status of a child.

The law of the domicil of the parties is generally the rule which governs the creation of the status of a child by adoption. *Foster* v. *Waterman*, 124 Mass. 592. 4 Phillimore, § 531. Whart. Confl. § 251. The status of the demandant, as adopted child of the intestate, in the State in which both were domiciled at the time of the adoption, was acquired in substantially the same manner, and was precisely the same so far as concerned his relation to, and his capacity to inherit the estate of, the

adopting father, as that which he might have acquired in this Commonwealth, had the parties been then domiciled here. In this respect, there is no conflict between the laws of the two Commonwealths. The difference between them in regard to the consent of the wife of the adopting father, and to the inheritance of estates limited to heirs of the body, or inheritance from the kindred, or through the children, of such father, are not material to this case, in which the only question is whether the adopted child or a brother of the adopting father has the better title to land in the absolute ownership of such father at the time of his death. Whatever effect the want of formal consent, on the part of the wife of the intestate, to the adoption of the demandant, might have, if she were claiming any interest in her husband's estate, it can have no bearing upon this controversy between the adopted child and a collateral heir.

The tenant in his argument laid much stress on the words of the statute of descents and of the statutes of adoption of this Commonwealth.

The statute of descents which was in force at the time of the death of the intestate in 1873 enacts that when a person dies intestate, seised of any real estate, it shall descend, subject to his debts, and saving rights of homestead, " in the manner following: First. In equal shares to his children, and to the issue of any deceased child by right of representation ; and if there is no child of the intestate living at his death, then to all his other lineal descendants," &c. " Second. If he leaves no issue, then to his father. Third. If he leaves no issue nor father, then in equal shares to his mother, brothers and sisters," &c. " Eighth. If the intestate leaves a widow and no kindred, his estate shall descend to his widow ; and if the intestate is a married woman and leaves no kindred, her estate shall descend to her husband. Ninth. If the intestate leaves no kindred, and no widow or husband, his or her estate shall escheat to the Commonwealth." Gen. Sts. c. 91, § 1. See also St. 1876, c. 220.

But this section must be understood as merely laying down general rules of inheritance, and not as completely and accurately defining how the status is to be created which gives the capacity to inherit. It does not undertake to prescribe who shall be considered a child, or a widow, or a husband, or what is

necessary to constitute the legal relation of husband and wife, or of parent and child. Those requisites must be sought elsewhere. The words " children " and " child," for instance, in the first clause, " issue," in the phrase " if he leaves no issue," in subsequent clauses, and " kindred," in the last two clauses of this section, clearly include a child made legitimate by the marriage of its parents and acknowledgment by the father after its birth under § 4 of the same chapter, or a child adopted under the provisions of *c.* 110 of the General Statutes, or *c.* 310 of the Statutes of 1871.

These statutes, after providing how a child may be adopted in this Commonwealth with the sanction of a decree of the Probate Court in the county in which the adopting parent resides, (or, under the St. of 1871, in the county where the child resides, if the adopting parent is not an inhabitant of this Commonwealth,) enact that a child " so adopted " shall be deemed, for the purpose of inheritance, and other legal consequences of the natural relation of parent and child, to be the child of the parent by adoption. St. 1851, *c.* 324, § 6. Gen. Sts. *c.* 110, § 7. St. 1871, *c.* 310, § 8. It is argued that the words " so adopted " imply that children otherwise adopted are incapable of inheriting lands in this Commonwealth. But it appears to us that these words, in the connection in which they stand, warrant no such implication; and that the Legislature, throughout these statutes, had solely in view adoption by or of inhabitants of this Commonwealth, and did not intend either to regulate the manner, or to define the effects, of adoption by and of inhabitants of other States according to the law of their domicil.

We are not aware of any case, in England or America, in which a change of status in the country of the domicil, with the formalities prescribed by its laws, has not been allowed full effect, as to the capacity thereby created of succeeding to and inheriting property, real as well as personal, in any other country the laws of which allow a like change of status in a like manner with a like effect under like circumstances.

We are therefore of opinion that the legal status of child of the intestate, once acquired by the demandant under a statute and by a judicial decree of the State of Pennsylvania, while the parties were domiciled there, continued after their removal into

this Commonwealth, and that by virtue thereof the demandant is entitled to maintain this action.

It is worthy of mention (although it cannot of course affect the rights of inheritance which had absolutely vested on the death of the intestate; *Tirrell* v. *Bacon*, 3 Fed. Rep. 62) that by a recent statute of this Commonwealth " any inhabitant of any other State, adopted as a child in accordance with the laws thereof, shall, upon proof of such fact, be entitled in this Commonwealth to the same rights, as regards succession to property, as he would have enjoyed in the State where such act of adoption was executed, except in so far as they conflict with the provisions of this act." St. 1876, *c.* 213, § 11.

*Judgment for the demandant.*