Dayton *v.* Adkisson.

WILLIAM C. DAYTON, trustee,

*v.*

MARGARET ANN ADKISSON et al.

A child born out of wedlock in Pennsylvania, and rendered legitimate by the subsequent marriage and cohabitation of its parents in that State, is competent to inherit land in New Jersey.

On final hearing, on pleadings and proofs taken before the court.

This is a bill in the nature of an interpleader by the heir at law of a devisee in trust of real estate, asking for direction to whom he shall convey the trust estate.

Perry Adkisson, the testator and devisor, was lost at sea in or about the year 1875. He left two children, twins, John Wesley Adkisson and Margaret Ann Adkisson, aged about five years, the children of a woman with whom he had been cohabiting. John Wesley Adkisson died in 1876, and the mother in February, 1877.

The testator and the mother lived together apparently as man and wife, in one house, in a court in the rear of No. 825 Carpenter street, in the city of Philadelphia, for about ten years previous to his being lost at sea, and in that house the twins were born in or about the year 1869 or 1870. She had been the widow of a soldier, and, as such, entitled to a pension during her widowhood.

NOTE.—In addition to the cases cited in *Ross* v. *Ross, 129 Mass. 243,* and in *Miller* v. *Miller. 91 N. Y. 315,* and in the notes to *Stewart* v. *Stewart, 4 Stew. Eq. 407,* and to *Bussom* v. *Forsyth, 5 Stew. Eq. 285,* a few recent cases are appended: *Atkinson* v. *Anderson, L. R. (21 Ch. Div.) 100; Re Grove, L. R. (40 Ch. Div.) 216; Keegan* v. *Geraghty, 101 Ill. 26; Stoltz* v. *Doering, 112 Ill. 234; Estate of Sunderland, 60 Iowa 732; Scott* v. *Key, 11 La. Ann. 232; Succession of Caballero, 24 La. Ann. 573; Stack* v. *Stack, 6 Dem. (N. Y.) 280.*—REP.

Dayton *v.* Adkisson.

The will is dated May 27th, 1872, and the body of it is in these words:

"I hereby constitute and appoint James B. Dayton executor of this my last will and testament and guardian of my two children, John Wesley and Margaret Ann, *children begotten by me on one Eliza C. Price, widow.*

"I give and devise and bequeath all my messuages, lands and tenements in the city of Camden, and State of New Jersey, to James B. Dayton, his heirs and assigns, with full power to sell and convey the same by good and sufficient deed of conveyance, whenever in his opinion it shall be for the benefit of my children so to do, and the rents or interest moneys from the same to devote to the education of my said children, christened John Wesley Adkisson and Margaret Ann Adkisson, until they arrive to twenty-one years of age, and then my executor is directed to convey to the said Margaret Ann my frame house on Division street, in the city of Camden, and to the said John Wesley my brick house on Locust street, in said city, or the proceeds of the same, if it should have been deemed expedient to sell the same, to the children named."

Mrs. Price (or Adkisson) left one sister, Rachel Dill, who, in the absence of legitimate offspring, would be her only heir at law. The executor died in 1886, leaving the complainant his heir at law.

The bill was originally framed upon the supposition that, if the children were bastards, the mother would inherit the land of her deceased son, John Wesley, under the act of March 9th, 1877 (*Rev. 1299*), (*a*) and Rachel Dill was accordingly made a party; but when it appeared, early in the hearing, that both mother and child died before that act was passed, Miss Dill's counsel abandoned all claim on her behalf, and, at the suggestion of the court, the bill was amended, and the attorney-general was brought in and appeared personally in court, and was content to submit to such decree as the court might see fit to make.

(*a*) That when any illegitimate person shall die seized of any lands, tenements or hereditaments, in his or her own right, in fee simple, without devising the same in due form of law, and without leaving lawful issue (and leaving a mother), then the inheritance shall go to the mother; *provided always*, that nothing contained in this act shall be construed or taken to bar or injure the rights or estate of a husband, as a tenant by the curtesy, or a widow's right of dower, or to make void or in any way affect any marriage settlement.

*Mr. C. V. D. Joline,* for the complainant.

*Mr. John F. Harned,* for Margaret Ann Adkisson, now, by marriage, Gibson.

*Mr. H. A. Drake,* for Miss Dill, and afterwards (by request. of the court) for the attorney-general.

PITNEY, V. C.

The question is, to whom shall the trustee convey the lot which by the will he was directed to convey to John Wesley Adkisson. The sister, Margaret Ann Adkisson (now, by marriage, Gibson) claims it on three grounds.

*First.* She claims that the proofs show that her father and mother were married, and that she and her brother were born in wedlock ; and she accounts for the language in her father's will by the fact that her mother was entitled to a pension during her widowhood, and desired the marriage to be concealed in order to enable her to continue to draw her pension.

*Second.* She insists that, if the proof fails to show a marriage before the birth of the twins, it is yet ample to show one to have taken place at some period during the cohabitation, and that, as her father and mother were domiciled in Pennsylvania, and the twins were born there, such marriage, though it may have taken place subsequent to the birth of the children, was sufficient, under the statute of Pennsylvania of May 4th, 1857 (*P. L. of 1857 p. 507, Brightley's Purdon's Digest 1873* § *9 p. 1004*), which provides that

"In any and every case where the father and mother of an illegitimate child shall enter into the bonds of holy wedlock and cohabit, such child or children shall thereby become legitimated, and enjoy all the rights and privileges as if they had been born during the wedlock of their parents,"

to render the twins legitimate ; and if legitimate in Pennsylvania, they are also legitimate in New Jersey, and competent to inherit from each other.

*Third.* That, as she is the twin sister of her deceased brother, she is his sister of the whole blood, and, as such, answers the description of the heir of a person dying without descendants, under the second section of our statute of descents.

The evidence, though somewhat conflicting, satisfies me that a marriage ceremony actually took place at some time between the testator and the woman he names in his will as "one Eliza C. Price, widow." The only difficulty I have is as to when it took place, whether before or after the birth of the children. But for the language of the will, I should have concluded that they were married at the time they went to live in the house in the court at the rear of No. 825 Carpenter street, Philadelphia, where they lived when the twins were born, and continued to live until their respective deaths. The evidence is clear ·that they lived there together as a man and wife would do. The woman· went by the name of Mrs. Adkisson. The testator directed a neighboring groceryman to give her credit as his wife during his absence on his periodical voyages to sea. He supported his family in the ordinary way, including two of her children by her former connections. He frequently expressed regret that he had married her, and one witness (Harmon) swears that he saw a marriage certificate framed and hung up in the room occupied by the parties. He says it was an ordinary printed blank marriage certificate filled up, and that it contained the names, in writing, of Perry Adkisson and Elizabeth Price, and was signed by one "Hardy [or Harding], minister of the Gospel," and that there was such a minister at that time, in the neighborhood, who is since deceased.

Criticism was made on this man's evidence on the ground that other witnesses who visited the house did not see the certificate, especially the sister and relatives of the woman Price or Adkisson; but it did not appear that these last witnesses could read. They did appear to be illiterate. I observed the witness Harmon carefully while giving his testimony and was impressed with his apparent truthfulness, and I feel constrained to give credit to his evidence in this respect.

Dayton v. Adkisson.

The non-production of the certificate was accounted for by the circumstance that the surviving twin was only about seven years of age at the time of her mother's death, and the few household effects of the family were taken by an older half-sister, the issue of a previous connection of the mother, which half-sister has since died in an almshouse. Margaret herself was taken away from her mother's friends, brought over into New Jersey, and taken care of by Mr. Dayton by being bound out to a farmer.

It does not appear to how late a date the mother continued to draw her pension ; but Miss Dill swears she went to the pension office after her sister's death and drew the arrearages of the pension—she did not say how much—due at her death.

Miss Dill, and the other relatives of the mother, lived in a part of the city distant from Carpenter court, and did not often visit there. They testified that the mother was known in their circle as Mrs. Price, and that she denied her marriage to Adkisson, saying she would not marry and give up her pension. This evidence, however, was given when it was supposed that, if there was no marriage, Miss Dill would acquire the lot in question as the heir of her sister, under the act of 1877.

But I deem it unnecessary to determine the question of fact, whether the marriage, which I am satisfied did take place, was prior or subsequent to the birth of the children, since it is clear from the evidence that the parties were domiciled in Pennsylvania, where the children were born, and continued to live in that State until they died, and that they were there married, and hence the children were rendered legitimate by the Pennsylvania act of 1857, and, being legitimate there, are, in my opinion, legitimate in this State, and therefore the surviving sister, Margaret Ann Adkisson, is entitled to the lot in question, as the heir of her deceased brother.

I do not deem it worth while to state, at any considerable length, the grounds upon which I reach this conclusion. They are stated elsewhere much better than I could state them.

The question involved was elaborately discussed in England in *Doe* v. *Vardill, 5 Barn. & C. 438; S. C. sub nom. Birtwhistle* v. *Vardill, 2 Cl. & F. 571; S. C., 7 Cl. & F. 895;* in New York

in *Miller* v. *Miller*, *91 N. Y. 315;* and in Massachusetts in *Ross*
v. *Ross*, *129 Mass. 243.* In the latter case, Chief-Justice Gray
cites and comments upon every case up to that date (1880), and
after an exhaustive discussion of the whole subject, comes to the
conclusion that the particular reasons that influenced the English
court in holding, in *Doe* v. *Vardill*, that an heir to land in England
must be actually *born in wedlock*, do not apply in this country,
and that a person declared to be a legitimate child of another, by
the law of the State of the domicile, must be held to have all the
rights of a legitimate child wherever he goes. The court of ap-
peals of New York, in 1883, in the case above cited, came to the
same conclusion in a case where a son born out of wedlock in
Germany was legitimized by the subsequent marriage and co-
habitation of his parents in Pennsylvania, by force of the same
statute above quoted, and held such son entitled to inherit lands
in New York.

The result in these cases has the support of Judge Story, in his
*Conflict of Laws*, § *93 et seq.;* of Dr. Wharton, in his work on
the same subject, § *240 et seq.;* and of Professor Parsons, in *2
Parsons on Contracts (5th ed.) 600.*

An examination of these cases will show that the contrary re-
sult in England was attempted to be justified by the language
of the statute, so called, of Merton, *20 Hen. III. c. 9*, which,
it was claimed, negatively enacted that the English heir must be
born in lawful wedlock. Lord Brougham, in *2 Cl. & F. 582*,
and again, in *7 Cl. & F. 914*, combats this position with argu-
ments that the courts of New York and Massachusetts seemed to
think unanswerable, and they appear so to me.

And see the strictures upon the result of the English decision
in the judgment of Lord Justice James in *Goodman's Trusts,
L. R. (17 Ch. Div.) 266, 296–298.*

The English judges, in *Doe* v. *Vardill*, did not deny, but ad-
mitted, that the effect of the Scotch marriage in that case was to
legitimize the previous-born issue, and that, being legitimate in
Scotland, the country of his domicile, he was also legitimate in
England. But they held, as before stated, that a person who
inherits land in England must not only be legitimate, but must

---

Dayton v. Adkisson.

---

have been actually *born in wedlock.   125 Mass. 252–254; 91 N. Y. 321, 322.*

It is worthy of remark, that the famous statute of Merton, *20 Hen. III. c. 9,* is, in fact, not a statute, but a mere entry on the minutes of parliament of a refusal by the English lords to assimilate the laws of England to that of other civilized countries, by affirmatively declaring that the marriage of the parents subsequent to the birth rendered the child legitimate.

An equivalent of this statute of Merton was enacted in Pennsylvania, *Purd. Dig. (9th. ed.) 565; P. L. of 1833, p. 318* (see the report of the judges, *3 Binn. 565–600*), and while in force produced the decision in *Smith* v. *Derr, 34 Pa. St. 126.*

I am unable to find among our statutes any enactment equivalent to the statute, so called, of Merton, and I think that public policy at this date favors the adoption of the rule which I have concluded to apply in this case, and that that rule ·is supported by the weight of authority in this country.   Statutes similar to that in Pennsylvania exist in many, if not most, of our sister States, and also statutes which provide, as our own does, for the adoption of children by legal proceedings.   Many persons come to reside among us from neighboring States, and from those countries of Europe governed by the civil law system, and bring with them children whom they suppose to be their lawful heirs for all purposes, but who would be denied the right of heirs as to real estate by the rule adopted in England in *Doe* v. *Vardill,* while, as to personal property, they would be lawful next of kin.   I do not think such a state of the law a desirable one, and am not willing to be the first judge to declare such to be the law in this State.   Nor do I think a law enabling, or even encouraging, parents to do simple justice to their innocent offspring, begotten out of wedlock, by investing them with the complete attributes of heirs, is immoral or tends to promote immorality.   I see no reason why a man should not be permitted to adopt and invest with rights of heirship his own illegitimate child by marrying its mother ; and I see no difference in morals between such mode of adoption and that provided by our statutes, which enables a

man to adopt, with that effect, even the illegitimate child of un-known parents.

I shall advise that a decree be made directing the complainant to convey the tract of land in question to Margaret Ann Gibson, and that there be a reference to a master to take and state the accounts of the income of the lands. Costs of all parties will be paid by the complainant out of the funds in his hands, if there be sufficient for that purpose, otherwise they will be a charge upon the land to be conveyed.