HARLE et al. v. HARLE.   (No. 7034.)

(Court of Civil Appeals of Texas. Dallas. April 11, 1914. Rehearings Denied May 2, 1914.)

1. ADVERSE POSSESSION (§ 115*)—SUFFICIENCY OF EVIDENCE.

In trespass to try title in which defendant claimed by adverse possession, evidence *held* at most to raise the issue of a conditional parol gift to such defendant from his father, and not to raise the issue of adverse possession by defendant.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 314, 691–701; Dec. Dig. § 115.*]

2. ADVERSE POSSESSION (§ 60*)—HOSTILE ENTRY.

One who enters upon land which he is entitled to acquire conditionally in acknowledgment of the superior right of another cannot claim by adverse possession, unless he meanwhile obtains a superior outstanding title, or repudiates the title under which he entered and gives its owner notice that he is claiming adversely to him.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 282–312, 323, 328; Dec. Dig. § 60.*]

3. HOMESTEAD (§ 119*)—CONVEYANCE BY HUSBAND—CONSENT OF WIFE.

In view of Const. art. 16, § 50, providing that a married man shall not sell the homestead without his wife's consent, given in the manner prescribed by law, title to the homestead could only pass by deed acknowledged by the wife apart from her husband; Rev. St. 1911, art. 1115, so requiring.

[Ed. Note.—For other cases, see Homestead, Cent. Dig. §§ 210–214; Dec. Dig. § 119.*]

4. ADOPTION (§ 23*)—INHERITANCE THROUGH ADOPTED CHILDREN — DESCENDANTS OF ADOPTED CHILD—"DESCENDANT."

Rev. St. 1911, art. 2469, provides that in the event of either spouse dying intestate with children surviving, the community property shall go, one-half to the survivor and one-half to such child or children, or their descendants. Rev. St. 1911, art. 1, permits any person wishing to adopt another as his "legal heir" to do so by filing a statement in the manner provided, and article 2 provides that such statement, signed, acknowledged, and recorded, shall entitle "the party so adopted to all the rights and privileges, both in law and equity, of a legal heir of the party so adopting him," and article 5 provides that the child or children so adopted shall have the same rights as against the person or persons adopting the child for support and maintenance, and for proper humane treatment, as a child has by law against lawful parents. *Held*, that the children of an adopted child inherit in the same manner as the descendants of a natural child, so that an adopted child's children become "descendants" of a child of intestate so as to take under article 2469.

[Ed. Note.—For other cases, see Adoption, Cent. Dig. § 42; Dec. Dig. § 23.*

For other definitions, see Words and Phrases, vol. 3, pp. 2014–2017; vol. 8, p. 7635.]

5. ADOPTION (§ 1*)—AT COMMON LAW.

Adoption was unknown at common law.

[Ed. Note.—For other cases, see Adoption, Cent. Dig. § 15; Dec. Dig. § 1.*]

6. ADOPTION (§ 3*)—CONSTRUCTION—ORDINARY MEANING OF LANGUAGE.

The legislative intention in enacting the adoption statutes should be determined by giving to the words therein their ordinary meaning.

[Ed. Note.—For other cases, see Adoption, Cent. Dig. §§ 1, 2; Dec. Dig. § 3.*]

7. ADOPTION (§ 3*)—EFFECT OF STATUTES.

Since adoption did not exist at common law, the adoption statutes (Rev. St. 1911, arts. 1–8), ingrafted upon the law of the state the provisions of the civil law on the subject, as well as its construction of the law thereon.

[Ed. Note.—For other cases, see Adoption, Cent. Dig. §§ 1, 2; Dec. Dig. § 3.*]

8. PARTITION (§ 5*)—ACT OF PARTIES.

Where land was deeded jointly to two persons upon consideration that each would pay his proportionate part of the purchase price, the subsequent division of the land by such grantees in that proportion, each agreeing to pay his part of the price, which was done, was a valid partition, binding upon the parties and their heirs.

[Ed. Note.—For other cases, see Partition, Cent. Dig. §§ 13–17; Dec. Dig. § 5.*]

Error to District Court, Navarro County; H. B. Daviss, Judge.

Trespass to try title by Nathan Harle against Bruff Harle, Freeman Slaughter, and John Harle, in which Wash McGriff, Nathan Slaughter, and others intervened. Judgment for Nathan Slaughter and others, interven-

---

ers, for John Harle, and for plaintiff, for certain amounts of land, and Bruff Harle and others bring error. Affirmed in part, and reversed and rendered in part.

W. W. Ballew, of Corsicana, for plaintiffs in error. McClellan & Prince and H. S. Melear, all of Corsicana, for defendant in error.

RASBURY, J. Nathan Harle sued Freeman Slaughter, John Harle, and Bruff Harle in trespass to try title to recover 160 acres of land in Navarro county. Freeman Slaughter by his answer claimed 40 acres of the tract, alleging that that amount had been set aside to him by agreement at the time the land was acquired jointly by him and Nathan Harle, and that he paid for that part of the tract and Harle the balance. John Harle by his answers claimed 60 acres of the land under deed from Nathan Harle and wife, and disclaimed as to the balance. Bruff Harle by his answer claimed 31.5 acres of the land by parol gift from Nathan Harle and wife, his father and stepmother, into possession of which he immediately entered, and upon which he had made valuable improvements, and of which he had been in actual, adverse, and peaceable possession for more than 10 years, exercising exclusive ownership and possession thereof and paying taxes thereon. He also claimed the land as an advancement by his father and stepmother in consideration of his having contributed largely to their support and to the purchase money of the land. He also attacked the deed from Nathan Harle to John Harle, which included the land claimed by him, on the ground that same had been obtained in fraud and by undue influence exercised by John Harle over his father and stepmother. Wash McGriff, the surviving husband, and several children of Mary Ann Harle, the adopted daughter of Gracie Ann Harle, deceased wife of Nathan Harle, intervened in the suit, alleging the death of Gracie Ann Harle prior to the institution of the suit, and that by reason thereof they were entitled to recover the entire community interest of Gracie Ann Harle in said land. Nathan Slaughter and others intervened in the suit alleging they were the children of Freeman and Amanda Slaughter, their mother being formerly Amanda Harle, a daughter of Nathan Harle by his first wife, and claimed the 40 acres of Freeman Slaughter, referred to in his pleading, and claimed also an additional 31.5 acres set aside to them under an agreement between their father, Freeman Slaughter, and their grandfather, Nathan Harle, and his wife.

The several interests in the land being urged as we have briefly but substantially stated, the testimony was developed and supports, in substance, the following conclusions: On March 22, 1879, A. G. Sloan and wife conveyed jointly to Nathan Harle and Freeman Slaughter the 160 acres of land involv-

ed in this suit. After Harle and Slaughter had gone into possession of the land, it was agreed that Harle should have and pay for three-fourths thereof and Slaughter for one-fourth, and that the land should be partitioned in that proportion. Pursuant to this agreement the land was partitioned, 40 acres being set off to Slaughter and 120 acres to Harle. Both Harle and Slaughter were at the time married, and both of them, in accordance with the agreement with their wives, went into possession of the lands agreed upon, Harle paying three-fourths and Slaughter one-fourth of the consideration recited in the joint deed. Harle and wife went upon and occupied the 120 acres as their homestead, and were occupying same as their homestead at the time the rights of the various parties to portions thereof are claimed to have accrued. In like manner did Freeman Slaughter and his wife occupy the 40 acres until June 21, 1894, when Slaughter's wife divorced him, and the possession and use of the land was awarded her along with the custody of the children. Subsequently she died, and the 40 acres were reoccupied by Slaughter. Nathan Harle was married twice. By his first wife he had three children, Bruff, John, and Amanda. By the second wife he had no children. The 160 acres were acquired by him and Freeman Slaughter after he married his second wife, Gracie Ann. His daughter, Amanda, married Freeman Slaughter, but died prior to the institution of this suit, leaving surviving her her husband, Freeman Slaughter, and several children, who are parties to the suit and designated as the Slaughter heirs. After the purchase of the land Nathan Harle's wife adopted Mary Ann Richardson, known thereafter as Mary Ann Harle, complying in that respect with the provisions of the adoption statutes. The adopted child married Wash McGriff, whom she bore three children, who are parties to this suit, being designated as the McGriffs. Nathan Harle's wife was dead at the time this suit was filed, as was also her adopted daughter, Gracie Ann Harle McGriff, the latter having died before her adoptive mother. The foregoing facts are undisputed.

There was testimony by Bruff Harle and other witnesses tending to show that in the early part of 1898 T. H. Bonner, at the request of Nathan Harle, surveyed the 120 acres of land belonging to him, setting same off in four approximately equal tracts, he and his wife agreeing at the time that one tract should go to Bruff Harle, one to John Harle, the other two tracts to go, one to the children of Mary Ann Harle McGriff, the other to Amanda Harle Slaughter's children, upon the death of Nathan and Gracie Ann Harle, Bruff Harle's testimony in relation to his rights at that time being, in effect, that his father pointed out the land, saying for him to take it and use it, and if what was left was not sufficient to afford a living for Nathan and

his wife, they would call on the part apportioned to Bruff for that purpose, and to the arrangement Bruff assented. The testimony of these witnesses further tended to show that Bruff Harle was living on the land prior to the survey under an agreement that he should have the land as a gift, in consideration of contributing to the support and maintenance of Nathan Harle and his wife, and had ever since that time been in adverse possession of the land, cultivating it and paying taxes thereon.. Nathan Harle denied the setting aside of the land, his explanation being that the land surveyed at a time when he contemplated making a will disposing of the land, and denied in toto the claim of Bruff Harle that the land had been given him as an advancement, etc., and claimed that he never surrendered control or possession of the land. We conclude as a fact that Nathan Harle did not surrender control or possession of the land. He further testified, in reference to Bruff's claim of advancement and gift, that Bruff Harle not only had not contributed to his support, but when called upon to do so had refused specifically to do so. In June, 1909, after the survey of the land, and after Bruff Harle claims he went in possession of the land under' an agreement to contribute to the support and maintenance of his father and stepmother, the latter two conveyed 60 acres of the 120 to their son, John Harle, which included the land claimed by Bruff Harle.

At the conclusion of the evidence the court instructed a verdict for Freeman Slaughter and his children against all other parties to the suit for the 40 acres claimed by Freeman Slaughter, to be used by him during his lifetime against any claims of his children; for John Harle for the 60 acres deeded to him by his father and stepmother against all parties to the suit, and for Nathan Harle for the remaining 60 acres against all the other parties to said suit. Upon the verdict so directed judgment was entered accordingly, from which this appeal is taken by Bruff Harle, the McGriffs, and the Slaughters. No appeal was taken by Freeman Slaughter. No attack is made on appeal against the judgment in favor of John Harle, who recovered the 60 acres acquired by the deed from his parents.

[1, 2] It is first urged by counsel for Bruff Harle that the court erred in withdrawing the case from the jury and instructing verdict against him, for the reason that the testimony without dispute showed that he had been in exclusive, adverse, and peaceable possession of the land for more than 12 years prior to the institution of the suit, and for that reason entitled to a judgment therefor. We conclude, as between Bruff Harle and Nathan Harle, his father, that the testimony at most raises the issue of a conditional parol gift. When he entered upon the land, it was by his own admissions an entry under executory contract, since the effect of the evidence

under one theory is to establish a holding under promise to contribute to the support of his parents, and under the other a holding subordinate to Harle's right to claim the land if he should need it. Accordingly, the action of the district judge in refusing to submit the questions of fact arising under the statute of limitation as pleaded by Bruff Harle was correct, since one who enters upon lands which he is entitled to acquire conditionally in acknowledgment of the superior right or title thereto of another cannot urge possession so secured, unless he has in the meanwhile come into a superior outstanding title, under the statutes of limitation, unless and until he shows a repudiation of the title under which he entered and puts the owner of such title upon notice that he is claiming the land adversely thereto. Bombarger v. Morrow, 61 Tex. 417; Flanagan v. Pearson, 61 Tex. 302; O'Connor v. Dykes, 29 S. W. 920; Robinson v. Bazoon, 79 Tex. 524, 15 S. W. 585; Smith v. Lee, 82 Tex. 124, 17 S. W. 598; Johnson v. Lockhart, 16 Tex. Civ. App. 32, 40 S. W. 640. While the pleading of Bruff Harle asserts a completed parol gift, and while the testimony raised the issue of a conditional parol gift, as we have said, neither the pleading nor proof shows a repudiation of the contract under which he entered the lands, and hence the rule stated applies in all respects, and it became immaterial on the question of limitation what the jury may have considered the facts to be concerning the period of time Bruff Harle had been in possession of the land, since his possession was not in law adverse.

[3] It is next urged on behalf of Bruff Harle, aside from the contention that he acquired the land by limitation, that the court should have submitted to the jury the issue of a completed unconditional parol gift of the lands, since that issue was raised by the evidence. Conceding for the purpose of determining the issue presented that the evidence raised the issue, although we think it did not, we conclude nevertheless that the court correctly withdrew the case from the jury for the reason that it appears without contradiction that the lands alleged to have been donated were at the time the homestead in fact of Nathan Harle and his wife, Gracie Ann, and, known to be such by Bruff Harle. Being the homestead, the lands could not be conveyed by parol gift, since title to the homestead can only be passed by deed acknowledged by the wife separately and apart from her husband, in the manner provided by the Constitution and statutes of this state and the construction placed thereon by our appellate courts. Const. art. 16, § 50; Rev. Stats. 1911, art. 1115; Stallings v. Hallam, 89 Tex. 431, 35 S. W. 2; Robert v. Ezell, 11 Tex. Civ. App. 176, 32 S. W. 362; Morris v. Wells, 27 Tex. Civ. App. 363, 66 S. W. 248.

[4] It is next urged in behalf of the McGriffs that the court also erred in directing a verdict adverse to them. As we have said,

the McGriffs were the children of Mary Ann McGriff, the adopted child of Gracie Ann Harle, who had a community interest of one-half in the land in dispute, and who died intestate, and childless, never having borne children, and having survived her adopted child. We conclude the court did err in the respect complained of, because we are of opinion that under our statutes regulating adoption and those regulating the descent of community property, and the construction that ought to be placed thereon, the children of an adopted child inherit in the same manner that the descendants of a natural child inherit. Article 2469, R. S. 1911, provides that in event of the death of either spouse intestate, with children surviving, the community property shall go, one-half to the survivor, and one-half to such child or children or their descendants. The question at once arises whether an adopted child, in contemplation of the statutes of descent and distribution and those of adoption, becomes in contemplation of law a natural child, so that such adopted child's children become "descendants" of a child of the intestate, and are permittted to inherit under the article cited instead of their deceased parent. Counsel have cited no case in point decided by the appellate courts of this state, nor have we been able to find one. Practically no help from the adoption statute can be had, since it provides that one may, on compliance with the formalities therein enumerated, adopt a "legal heir," and that the person so adopted shall have "all the rights and privileges, both in law and equity, of a legal heir of the party so adopting him," save that such adopted child may inherit only one-fourth of the estate of the adopting person, if such adopting person at the time or thereafter have "a child begotten in lawful wedlock." Articles 1, 2, R. S. 1911.

[5, 6] Reference to the rules in force concerning adoption prior to the adoption of the common law in this state affords no assistance in the interpretation of the statute, since the present statute and the one by authority of which Mary Ann McGriff was adopted was enacted after the act by which the common law of England became the rule of decision in this state, when not "inconsistent" with the Constitution and laws of this state. Article 5492, R. S. 1911. Besides, adoption was unknown to the common law ; and, when the Legislature passed the present statute conferring the right on any person to adopt an "heir," a common-law rule of decision or interpretation was impossible, since there was no such rule at common law, and had there been one, it would not have been applicable in toto if "inconsistent" with the statutes of adoption passed by the Legislature. So it results, it occurs to us, that in construing the statute we shall resort to the ordinary principles of construction in determining the effect of the statute. In many of the states both the statute authorizing adoption and the statute of descent control and restrict the rights of those adopted, but, subject to such modifications, there is singular uniformity in the enunciation of the general rules by all the courts. In reference to the construction to be placed on such statutes, an accepted authority says that "the authorities unite in affirming that for all purposes of inheritance from the adoptive parent the adopted child becomes and is the lawful child of such adoptive parent save in so far as the statute authorizing the adoption may otherwise provide. Such inheritable right does not conflict with the statute of descents, for the statute in regard to adoption points out who are to be considered children within the meaning of the statute of descents, nor with the right of the adoptive parent to dispose of his property by will. However, as against an adopted child, the statute should be strictly construed, because it is in derogation of the general law of inheritance, which is founded on natural relationship, and is a rule of succession, according to nature, which has prevailed from time immemorial." 1 Cyc. 931. We assume that the strict construction contended for by the writer just quoted has reference of course to a compliance with the formalities prescribed by the statute, and not in reference to the rights of the adopted person when legally adopted. For in construing the rights of the child when formally adopted, the intention of the Legislature in the enactment of the statute should be determined by importing to the words therein their ordinary signification and common meaning.

[7] The case of Eckford v. Knox, 67 Tex. 200, 2 S. W. 372, is the only case that has, to any considerable extent, construed the adoption statutes, and in that case the point at issue here was not involved. However, in our opinion, it is persuasive of our view that, "if an adopted child dies during the life of its adopting parent, leaving children, such children are for most, if not for all, purposes regarded as natural grandchildren of the adopting parent, and entitled to represent their parent and to receive from the estate of his adopting parent what he would have been entitled to receive had he lived until after such parent's death." 1 R. C. L. 614. In Eckford v. Knox, supra, it is said, in effect, that the designation of the adopted child as "legal heir" has no significance since, strictly speaking, there is no such thing as the heir of a living person, and that the use of the term, "legal heir," means simply that if the person so designated is living at the death of the adopting party he shall become entitled to an interest in all his property of which he shall die intestate. Hence no restricted meaning may be placed upon the words legal heir. On the contrary, the words must be held to mean that which will most likely promote the evident purpose of the statute. It is also further said in that case that an adopted heir

may not be postponed in his right of inheritance to others who are not themselves heirs, and that he can be disinherited only in such manner as any lawfully begotten heir may be, and that he stands as to his right of inheritance on the same plane with children born in lawful wedlock, save as to the restriction in the amount he may inherit, and that such views derive strength from the general rules governing adoption wherever it prevails. It is further said in that case that our statute imports the civil law of adoption into our jurisprudence with modifications. This we think may not be intelligently refuted, since the right of adoption did not exist at common law, and the result of the passage of the statute was to ingraft upon our jurisprudence that feature of the civil law and the construction placed upon it by the civilians. And while not passing upon the issue involved in the instant case, Mr. Chief Justice Willie, in the opinion, in order to sustain the right of inheritance of a living adopted child, as a natural child, approvingly refers to the rule.of the civilians that the one adopted stood in the relation of child to his adopter, "and his children became the grandchildren of such person." The culminating conclusion of law just quoted from the Eckford-Knox Case seems to us conclusive of the issue. The rule stated seems to be the one in force in most of the states of the Union.

A case much in point with the instant case is Power et al. v. Hafley, 85 Ky.·671, 4 S. W. 683. Kentucky, at the time Hafley desired to adopt one Sylvania Floyd, had no statute authorizing the adoption of a person, and applied to the Legislature for authority to do so. The Legislature passed an act which, in effect, permitted Hafley to adopt Sylvania "as his legal heir," and permitting her to take and hold the estate of Hafley "by descent * * * in as full and complete a manner as if she was his lawful child." By way of comparison with the quoted act of the Kentucky Legislature, our statutes provide that one adopted under its terms shall be entitled "to all the rights and privileges, both in law and equity, of a legal heir of the party so adopting him," and by subsequent article 5 that he shall have the same rights against the person adopting him for support and maintenance and proper and humane treatment "as a child has by law against lawful parents." Thus it will be seen there is no substantial difference in the enactments. Sylvania died before her adoptive father, leaving children, and after the death of the adoptive father the contention was that her children could not inherit through their mother, since Sylvania's right to inherit was personal and died with her. · In disposing of the contention the court said: "The common law made no provision for adopting children. Hence we get no light from that law to guide ·us in the present investigation. Most of the states of the Union have within the last few years enacted general laws providing for the adoption of children, and making them the legal heirs of the adopting parents through the courts. Of course, the laws of these states are not uniform in substance; the laws of each more or less limit and restrict the legal status of the adopting parent and the adopted child; and, while the reported adjudications of these states construing the adopting statutes are sparse, yet they nearly all agree in fixing the legal·status of the adopted child as follows: That it is the event of adoption that fixes, under the law authorizing the adoption, the legal status of the adopted child; and the child, by the event of adoption, becomes the legal child of the adopting parents, and stands, as to the property of the adopting parent, in the same light as a child born in lawful wedlock, save in so far as the exceptions in the statute authorizing the adoption declare otherwise. And, when the statute authorizes a full and complete adoption, the child adopted thereunder acquires all of the legal rights and capacity, including that of inheritance of a natural child, and is under the same duties. See Humphries v. Davis, 100 Ind. 280 [50 Am. Rep. 788]; Wagner v. Varner, 50 Iowa, 532; Barnes v. Allen, 25 Ind. 222; Burrage v. Briggs, 120 Mass. 103; Ross v. Ross, 129 Mass. 243 [37 Am. Rep. 321]. By the request of Frederick Hafley, the Legislature, by the act supra, made Sylvania his legal heir, and invested her with as full capacity to take and hold his estate by descent as if she was his natural child. Thus was her legal status fixed by a law· operating directly upon her and Hafley, and which contained no restrictions or limitations whatever. She was made a full legal heir, and was put precisely upon the same footing, so far as taking and holding Hafley's property by descent was concerned, of a natural child. So it would seem to follow as a logical sequence that the children of Sylvania, she having died before Hafley, take, under our laws of descent, as her direct representatives. As before stated, the common law made no provision in reference to adopting children; but the civil law made ample provision in that regard; and, presuming that the Legislature, in passing the act supra, and subsequently passing a general law upon the same subject, had in view the principles of the civil law, we have therefore deemed it proper to consult the principles of that law in arriving at the construction we have given said act. By that law (the civil) the adopted child was 'assimilated in many points to a son born in lawful matrimony.' The adopted child retained all of the family rights resulting from its birth, and there was secured to it all of the family rights procured by the adoption. See Sander's· Justinian, 103, 105, 107. Also, in the case of Vidal v. Commagere, 13 La. Ann. 519, it is said that by the civil law the effect

of adoption was such 'that the person adopted stood not only himself in relation of child to him adopting, but his children became the grandchildren of such person.' So, taking the logical sequence of the language of the act supra, aided, as it is, by the principles of the civil law, the conclusion is inevitable that the appellants are the legal grandchildren of Frederick Hafley, and as such are entitled to share in the distribution of his estate under our laws of descent."

We concur in the conclusion reached in the case from which we have quoted that it is the act of adoption that fixes the status of the adopted child, and that the effect of adoption under our statute is to constitute the one adopted the child of the adopting person in the same manner, as said in Eckford v. Knox, supra, "as if she had been his child born in lawful wedlock, subject only to the limitations contained in the proviso to article 2." Then if the act of adoption fixed the status of the adopted child as one "born in lawful wedlock," it would follow as a consequence that the children of such child would, as her descendants, be entitled to receive, from the estate of the adoptive parent dying intestate, in the same manner and to the same extent the adopted child would have taken had she survived the adoptive parent.

Nor do we think the construction we have placed upon the statutes of adoption is, as argued, in conflict with article 2469, R. S. 1911, which directs that upon dissolution of the marriage relation by death, one-half of the community property shall descend to the child or children, if living, of the deceased intestate spouse or their descendants. "Child" has reference as much to adopted child as to natural child. If only natural child was meant, the adoption of an heir would be futile, since the effect would be to destroy the adoption statutes in toto, and because, under such construction it could be said that, the descent of community property being confined to natural children, it could not be diverted by the provisions of the adoption statutes, even during the life of the one adopted. The fact that both acts are in existence emphasizes the conclusion that it was intended that an adopted person should be considered as a natural child, and inherit as such as restricted by the act. It is true that it was held in Burgess v. Hargrove, 64 Tex. 110, in construing the old provision directing the descent of the community property, that "child" did not include grandchild. It was to meet such construction that the act was subsequently amended as it now reads so as to include child or children or their descendants. But it cannot be deduced from the holding that "child" does not include grandchild that it also does not include adopted child. Further, we think the holding in that case is beside the issue involved here, and throws no light on the question,

and decides only that the first degree of consanguinity does not include, as matter of law, the second any more than it does the third.

In view of what we have said, we conclude that when Gracie Ann Harle adopted Mary Ann as provided by law, she became, for all purposes of inheritance, a natural child, and that her descendants were entitled to inherit the entire interest of Gracie Ann in the community property of Gracie Ann and Nathan Harle, since Gracie Ann had no child when she adopted Mary Ann, nor was such child born prior to her death.

[8] It is next urged in behalf of the Slaughter children that the court erred in directing verdict against them. As we have recited, these parties were the children of Amanda Harle Slaughter, who was Nathan Harle's daughter by his first wife. Nathan Harle acquired the land after Amanda Slaughter's mother died, and after he married his second wife, and Amanda's children therefore have no inheritable interest in the land only through their grandfather, Nathan Harle. The error urged, however, arises upon the holding by the district judge that there was a lawful partition and division between Freeman Slaughter and Nathan Harle of the land deeded to them jointly. The land was as matter of fact deeded to Harle and Freeman Slaughter jointly, as we have shown at another place, but it was not disputed by either; on the contrary, it was stated by both to be a fact that there was a division and partition of the land, three-fourths being set off to Harle, and one-fourth to Slaughter, each agreeing to pay for same in that proportion, which was done. Each went into actual possession of the portion awarded him with his family, and have since occupied same. Such a partition and division of lands deeded jointly to two grantees, upon consideration that each will pay that proportion of the purchase money that his part of the land bears thereto, is a valid and effective partition, and may not be subsequently attacked by his children, if such division was acted upon, and the purchase price agreed on paid by both parties and possession of the respective tracts of land so set off taken by each, as was done in the instant case. Cagle v. Tucker, 14 Tex. Civ. App. 316, 37 S. W. 180. Hence any issue dependent for its force on the invalidity of such division and partition becomes immaterial under our holding that the partition was effective, and a discussion thereof unnecessary.

With our holding that the evidence without dispute establishes a division and partition of the 160 acres between Freeman Slaughter and Nathan Harle, it becomes unnecessary to discuss seriatim the several remaining assignments of the Slaughters, since the same raise issues similar to those raised by Bruff Harle, and which we have decided adversely to the contention of the Slaughters.

The judgment of the trial court is affirmed in all respects, save as to the McGriffs. As to them the judgment of the lower court is reversed, and judgment here. rendered for said heirs, directing that said heirs recover of Nathan Harle an undivided one-half interest in the 60 acres of land awarded to said Nathan Harle by the court below, subject to the right of said Harle to possession and occupancy of said land as a homestead during his life time.

Affirmed in part and reversed and rendered in part.